UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA   )   DOCKET NO. 5:14-CR-81
   )
     vs.   )   VOLUME I
   )
ROGER DALE FRANKLIN,   )
   )
       Defendant.   )
_____)


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
JULY 7, 2015




<u>APPEARANCES</u>:

On Behalf of the Government:

     STEVEN KAUFMAN, ESQ.
     United States Attorney's Office
     227 West Trade Street, Suite 1700
     Charlotte, North Carolina

On Behalf of the Defendant:

     HAAKON THORSEN, ESQ.
     Law Offices of Haakon Thorsen
     1235-E East Boulevard, #239
     Charlotte, North Carolina




          Cheryl A. Nuccio, RMR-CRR
           Official Court Reporter
         United States District Court
          Charlotte, North Carolina

I N D E X

GOVERNMENT'S WITNESSES                                    PAGE

JOHN DAVID BARBOUR
    Direct Examination By Mr. Kaufman                      18
    Cross Examination By Mr. Thorsen                       32
    Redirect Examination By Mr. Kaufman                    37

MARTIN SHAW CRISP
    Direct Examination By Mr. Kaufman                      40
    Cross Examination By Mr. Thorsen                       49

STACY HUFFMAN
    Direct Examination By Mr. Kaufman                      52
    Cross Examination By Mr. Thorsen                       55

LISA DAWN WENTWORTH
    Direct Examination By Mr. Kaufman                      56
    Cross Examination By Mr. Thorsen                       66
    Redirect Examination By Mr. Kaufman                    74

SHEILA HAMBY SIPES
    Direct Examination By Mr. Kaufman                      77
    Cross Examination By Mr. Thorsen                       80
    Redirect Examination By Mr. Kaufman                    82

TERRI ELAINE CLARK
    Direct Examination By Mr. Kaufman                      82
    Cross Examination By Mr. Thorsen                       87

WILLIAM CLYDE TOWNSEND
    Direct Examination By Mr. Kaufman                      91
    Cross Examination By Mr. Thorsen                       95

1                         E X H I B I T S

2    GOVERNMENT'S EXHIBITS

3    <u>NUMBER</u>                                              <u>ADMITTED</u>

4    1  .......................................................22
     2  .......................................................22
5    3  .......................................................22
     4  .......................................................22
6    11A .......................................................47
     11B .......................................................47
7    11C .......................................................47
     13A .......................................................26
8    13B .......................................................22
     13C .......................................................26
9    13D .......................................................26
     13E .......................................................26
10   13F .......................................................26
     13G .......................................................26
11   13H .......................................................26
     15A .......................................................31
12   15B .......................................................22
     15C .......................................................31

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1
2          (Jury selection.)
3          THE COURT:  All right.  Madam Clerk, if you would
4    please impanel the jury.
5          THE CLERK:  Yes, sir.
6          (All 14 jurors were duly impaneled.)
7          THE COURT:  Thank you, Madam Clerk.
8          Now, members of the jury, I will give you some
9    preliminary instructions to guide you in your participation in
10   the trial now that you have been sworn.
11         It will be your duty to find from the evidence what
12   the facts are.  You and you alone are the judges of the facts.
13   And you apply to the facts that you find from the evidence the
14   law that the Court will give to you.  And you must follow that
15   law whether you agree with it or not.  And that, of course,
16   ensures that we all abide by the same law.
17         Nothing that the Court, meaning the presiding judge,
18   says or does during the course of the trial should be taken by
19   you as indicating what your verdict should be.
20         The evidence from which you will find the facts will
21   consist of the testimony of the witnesses, the documents and
22   other things received into the record as exhibits, and also
23   any facts the lawyers agree or stipulate to or that the Court
24   will instruct you to find.
25         On the other hand, certain things are not evidence

1  and must not be considered by you.  I will list those for you

2  now.

3          First of all, the statements, the arguments, and the

4  questions by the lawyers are not evidence so you have to make

5  a distinction in your mind between what is said from the

6  witness stand, which is evidence, and that which is said by

7  the lawyers, which is not.

8          The questions to objections -- or rather, objections

9  raised by the lawyers to certain evidence are not evidence.

10  The lawyers have an obligation to their respective clients to

11  make objection when they think something being offered in

12  evidence may be improper under the rules of evidence.  You

13  should not be influenced by the objection or by the Court's

14  ruling on it.

15          If you are instructed that some item of evidence is

16  to be received for a limited purpose only, you must follow

17  that instruction.

18          Testimony that the Court excludes, that is, tells

19  you to disregard, is not evidence and must not be considered.

20          Now, anything that you may have seen or heard

21  outside the courtroom is not evidence and must be disregarded.

22  You are to decide the case solely on the evidence presented

23  here in the courtroom.

24          There are two kinds of evidence, direct and

25  circumstantial.  Direct evidence is direct proof of a fact

such as testimony of an eye witness.  Circumstantial evidence
is proof of facts from which you may infer or conclude that
other facts exist.  I'll give you other instructions on this
and other matters at the end of the case, but keep in mind you
may consider both types of evidence on an equal footing.

It will be up to you to decide which witnesses to
believe and which not to believe or how much of any witness's
testimony to accept or reject.  I'll give you some guidelines
for determining the credibility of witnesses toward the end of
the case.

Now, as you've been told, this is a criminal case
which distinguishes it from civil cases which are between
private parties.  In a criminal case there are three basic
rules that you must keep in mind.

First, the defendant is presumed innocent unless and
until proven guilty.  The indictment brought by the government
against the defendant is only an accusation, nothing more.  It
is not proof of guilt or anything else.  The defendant,
therefore, starts out with a clean slate.

Secondly, the burden of proof is on the government
throughout the case.  The defendant has no burden to prove his
innocence or to present any evidence or to testify.  And since
he has that right, the law prohibits you from arriving at your
verdict by considering that he may not have testified.

Third, the government must prove the defendant's

1  guilt beyond a reasonable doubt before there could be a
2  conviction.  I'll give you other instructions on this point
3  later, but keep in mind that in this respect a criminal case
4  is different from a civil case.

5          I will go through the indictment so you'll know what
6  the charges are.  I remind you that the indictment is not
7  evidence as I just stated.  It is not proof of guilt or
8  anything else.  It's merely an accusation and it brings the
9  matter before you for decision.

10         Count one alleges that from in or about 2007 to in
11  or about 2014, in Caldwell County and Burke County, within the
12  Western District of North Carolina, and elsewhere, the
13  defendant, Roger Dale Franklin, did knowingly and
14  intentionally combine, conspire, confederate, and agree with
15  other persons known and unknown to the grand jury to
16  distribute and to possess with intent to distribute a mixture
17  and substance containing a detectable amount of
18  methamphetamine, a Schedule II controlled substance, in
19  violation of Sections 846 and 841(a)(1) of Title 21 of the
20  United States Code.

21         The indictment goes on to allege that the quantity
22  of methamphetamine involved in the conspiracy was 500 grams or
23  more of a mixture and substance containing a detectable amount
24  of methamphetamine.

25         You'll have a copy of the indictment available to

1  you in the jury room if you need to consult it later on.

2          So count two alleges that on or about July 6, 2013,

3  in Burke County, within the Western District of North

4  Carolina, and elsewhere, the defendant, Roger Dale Franklin,

5  did knowingly and intentionally possess with intent to

6  distribute a controlled substance, that is, a mixture and

7  substance containing a detectable amount of methamphetamine, a

8  Schedule II controlled substance, in violation of law.

9          Count three alleges that on or about July 6, 2013,

10  in Burke County, within the Western District of North

11  Carolina, and elsewhere, that Roger Dale Franklin, in

12  furtherance of a drug trafficking crime, that is, possession

13  with intent to distribute methamphetamine, a violation of

14  Title 21, U.S. Code, Section 841, as charged in count two, for

15  which he may be prosecuted in a court of the United States,

16  did knowingly and unlawfully possess one or more firearms, and

17  did aid and abet the same.  And the statutes under which that

18  charge is brought are listed.

19          Then in count four, it alleges that on or about

20  July 6, 2013, in Burke County, within the Western District of

21  North Carolina, and elsewhere, the defendant, Roger Dale

22  Franklin, having previously been convicted of one or more

23  crimes punishable by a term of imprisonment exceeding one

24  year, did knowingly possess in and affecting commerce one or

25  more firearms, that is, a Taurus TCP .380 caliber handgun and

1   ammunition.  And the statute under which that charge is
2   brought is also listed.

3          And it goes on to count five.  There are nine
4   counts.  Count five alleges that on or about August 19, 2013,
5   in Caldwell County, within the Western District of North
6   Carolina, and elsewhere, that the defendant did knowingly and
7   intentionally possess with intent to distribute a controlled
8   substance, that is, a mixture and substance containing a
9   detectable amount of methamphetamine, a Schedule II controlled
10  substance.  And the statutes are also listed.

11         Count six alleges that on that same date, in
12  Caldwell County, within the Western District of North
13  Carolina, and elsewhere, the defendant, in furtherance of a
14  drug trafficking crime, that is, conspiracy to distribute and
15  to possess with intent to distribute methamphetamine, a
16  violation of Title 21, U.S. Code, Section 846 as alleged in
17  count one, and possession with intent to distribute
18  methamphetamine, a violation of Title 21, U.S. Code,
19  Section 841 as charged in count five for which he may be
20  prosecuted in a court of the United States, did knowingly and
21  unlawfully possess one or more firearms, and did aid and abet
22  the same.

23         Count seven alleges that on the same date, that is,
24  August 19, 2013, in Caldwell County, within the Western
25  District of North Carolina, and elsewhere, the defendant,

1  having previously been convicted of one or more crimes

2  punishable by imprisonment for a term exceeding one year, did

3  knowingly possess in and affecting commerce one or more

4  firearms, that is, an Interarms .38 Special revolver and

5  ammunition.

6        Count eight alleges that on or about September 3,

7  2013, in Caldwell County, within the Western District of North

8  Carolina, and elsewhere, the defendant did knowingly and

9  intentionally possess with intent to distribute a controlled

10  substance, that is, a mixture and substance containing a

11  detectable amount of methamphetamine, a Schedule II controlled

12  substance, and the statutes are listed.

13        Count nine alleges that on or about November 20,

14  2013, in Caldwell County, within the Western District of North

15  Carolina, and elsewhere, defendant did knowingly and

16  intentionally possess with intent to distribute a controlled

17  substance, that is, a mixture and substance containing a

18  detectable amount of methamphetamine, a Schedule II controlled

19  substance, in violation of Title 21, U.S. Code, Section

20  841(a).

21        I haven't read every word of the indictment because

22  most of what I didn't read was simply references to the

23  statutes under which the charges are brought.

24        And you'll notice that some of the offenses listed

25  other of the offenses and you'll find that on the verdict

1  sheet that will be present in the jury room as you work
2  through the evidence and consider the matter, that you'll be
3  asked questions on the verdict sheet that proceed beginning
4  with count one and go through the indictment so that you'll
5  have the ability to understand how the counts might relate to
6  each other according to how you find.  And I think you won't
7  have any trouble being confused by how that goes.
8          Thank you for your attention to that matter.
9          Now, a few words about your conduct as jurors.
10          You, as jurors, must decide this case based solely
11  on the evidence presented within the four walls of this
12  courtroom.  This means that during the trial you must not
13  conduct any independent research about this case, anything
14  having to do with the case and the individuals involved in the
15  case.  In other words, you should not consult dictionaries or
16  reference materials, search the internet, websites or blogs or
17  use any electronic tools to obtain information about this case
18  or help you decide this case.
19          Please do not try to find out information from any
20  source outside the confines of this courtroom through the
21  process presented by law.  Until you retire to deliberate, you
22  must not discuss this case with anyone, including your fellow
23  jurors.  After you retire to deliberate, you may begin
24  discussing the case with your fellow jurors, but you cannot
25  discuss the case with anyone else until you have returned a

1  verdict and the case is at an end.

2          So if we have a two-day trial and you go on home

3  this evening and someone should ask you about the case, you

4  would simply tell them the judge has instructed you not to

5  talk about it until it's over, at which time you can talk

6  about it all you want.  That would be up to you.

7          Now, I know that many of you use cell phones,

8  BlackBerrys, iPhones, the internet, and other tools of

9  technology.  You also must not talk to anyone at any time

10  about this case or use these tools to communicate

11  electronically with anyone about the case.  This includes your

12  family and friends.  You may not communicate with anyone about

13  the case on your cell phone, through email, BlackBerry,

14  iPhone, text messaging, on Twitter or through any blog or

15  website, including Facebook, Google, MySpace, LinkedIn or

16  YouTube.  You may not use any similar technology of social

17  media even if I have not specifically mentioned it here.  I

18  expect you would inform me as soon as you become aware of any

19  other juror's violation of these instructions.  A juror who

20  violates these restrictions jeopardizes the fairness of these

21  proceedings and a mistrial could result which would require

22  the entire process to start over.

23          Finally, do not form any opinion until all the

24  evidence is in.  Obviously, you can't hear all the evidence in

25  the twinkling of an eye.  It has to come in witness by

1   witness, examination, cross examination, the government case,
2   the defendant has an opportunity to present a case if he sees
3   fit.  In other words, you haven't heard it all until you have
4   heard it all.  So keep an open mind about it.
5           Now, if you want to take notes during the trial, you
6   may do that.  You have a notebook there, I believe.  If not
7   already, you will have one.  But it's going to be a short
8   trial and it likely would not require you to take any
9   extensive notes.
10          If you do take notes, however, be sure that your
11  note taking does not interfere with your listening to and
12  considering all the evidence.  And if you do take notes, you
13  would not discuss them with anyone before you begin your
14  deliberations.  You would not take your notes with you at the
15  end of the day.  You would leave them either at your seats
16  there in the jury box or in the jury room.
17          And if you choose not to take notes, remember, it's
18  your own individual responsibility to listen carefully to the
19  evidence.  You can't give that responsibility to someone who
20  may be taking notes.  We depend on the judgment of all members
21  of the jury and you must all remember the evidence in the
22  case.
23          Now, the outline of how the matter will proceed goes
24  as follows:
25          The government would make an opening statement which

1  is simply an outline to help you understand the evidence as it
2  comes in.  Next, the defense attorney may, if he wishes, make
3  an opening statement at that time or he may reserve it for
4  later.  Opening statements are neither evidence nor arguments.
5  They're just supposed to be a bit of a road map to tell you
6  what the evidence may show.

7          The government will then present its witnesses.
8  Counsel for the defendant may cross examine them.  Following
9  the government's case, the defendant may, if he wishes,
10 present witnesses whom the government may cross examine.

11         After all the evidence is in, the attorneys will
12 present their closing arguments to summarize and interpret the
13 evidence for you and the Court will instruct you on the law.
14 After that, you'll retire to deliberate on your verdict.

15         We'll normally take a break either -- well, midday,
16 in the morning and likewise in the afternoon.  But if anybody
17 needs an additional break, feel free to raise your hand and
18 get the attention of me or the clerk or the marshal and we'll
19 have another break.

20         At times the Court may need to discuss matters with
21 the attorneys, something about the law or some administrative
22 matter.  If we do that, we'll step over here to the sidebar to
23 do that and, in order to save time, the jury may stay there at
24 the -- at your seats.  And during a sidebar you may stand and
25 stretch and speak to one another, but not about the case.

1  Normally that only takes a moment or two so that saves time
2  not having to send the jury out while we do a sidebar.
3          Thank you very much for your attention to these
4  matters.  That will conclude the preliminary instructions.
5  And anybody want a break at this point?  Otherwise, we'll go
6  into opening statements.
7          (No response.)
8          THE COURT:  All right.  Will the government have an
9  opening statement?
10          MR. KAUFMAN:  Yes, Your Honor.
11          THE COURT:  You may proceed.
12          MR. KAUFMAN:  Thank you, Your Honor.
13          May it please the Court, counsel:
14          Ladies and gentlemen, I'll be very brief.  The
15  defendant in this case, Roger Dale Franklin, was a
16  methamphetamine trafficker for quite some time with several
17  other individuals in Caldwell County.  You're going to
18  actually hear about not once, not twice, not three times, but
19  four different times that law enforcement officers found
20  Mr. Franklin with methamphetamine in his vehicle.  On two of
21  those occasions you're going to hear that he had a firearm in
22  the truck as well.
23          Now, you're going to hear testimony -- or you're
24  going to hear evidence actually by stipulation that
25  Mr. Franklin is a convicted felon and therefore it was

1    unlawful for him to have a firearm at all.  But you'll also

2    hear evidence to allow you to conclude that he was also having

3    that firearm in furtherance of the drug trafficking, that is,

4    to protect himself, his money, his drugs from would be

5    robbers, competitor drug dealers.

6         The testimony that you're going to be hearing from

7    is three law enforcement officers.  They'll be testifying

8    under oath, as will three or four co-conspirators from the

9    conspiracy itself.  And they'll testify under oath that they

10   have already accepted responsibility.  Have given statements

11   to law enforcement about what they had done themselves and

12   what they had done with Mr. Franklin.

13        At the conclusion of the evidence, ladies and

14   gentlemen, we'll be asking you to return a verdict of guilty

15   as charged.

16        THE COURT:  Mr. Thorsen, will the defendant have an

17   opening statement at this time?

18        MR. THORSEN:  Yes, we will.  Thank you, Your Honor.

19        Members of the jury, the evidence is not going to

20   show Roger Franklin in possession of a gun.  It's not going to

21   show him in possession of methamphetamine.  It's going to show

22   him making some bad decisions.  Being drunk at different times

23   and getting rides from people who had guns in their car and

24   were dealing methamphetamine.

25        The fact that he was hanging out with people who

1  were involved in methamphetamine trafficking was the big
2  decision that he made wrong.  He never sold meth himself.  He
3  wasn't a member of the conspiracy to sell meth.  He was
4  somebody who was just there and now people in that conspiracy,
5  you are going to examine their testimony.  You'll see they
6  have motives to say that he was involved.  And when you
7  consider their testimony, you're going to find it really does
8  not establish Roger Franklin's guilt.  It doesn't show him in
9  possession of guns.

10              You'll go through all the different charges and
11  you'll return not guilty verdicts on each charge.

12              THE COURT:  All right.  You may call your first
13  witness.

14              MR. KAUFMAN:  Your Honor, may we take our first
15  comfort break of the morning?

16              THE COURT:  We'll do that.  Members of the jury, you
17  may step into the jury room.  We'll call for you in about 15
18  minutes.

19              (Brief recess at 10:30 a.m.)

20              (Court resumed at 10:53 a.m.)

21              THE COURT:  All right.  May we have the jury,
22  please.

23              (Jury entered the courtroom.)

24              THE COURT:  All right.  The jury is seated.  You may
25  call your first witness.

JOHN BARBOUR - DIRECT

1      MR. KAUFMAN:  Thank you, Your Honor.

2      We call investigator David Barbour.

3      JOHN DAVID BARBOUR, GOVERNMENT WITNESS, SWORN,

4                   DIRECT EXAMINATION

5  BY MR. KAUFMAN:

6  Q.   Good morning, sir.

7  A.   Good morning.

8  Q.   If you would, please tell the jury your full name.

9  A.   My name is John David Barbour.

10 Q.   And how do you spell your last name?

11 A.   B-a-r-b-o-u-r.

12 Q.   What do you do?

13 A.   I'm a sergeant over the narcotics division for the

14 Caldwell County Sheriff's Department in Caldwell County.

15 Q.   If you could, give the jury a brief nutshell of your

16 career in law enforcement.

17 A.   Sure.  I began law enforcement in 1992 with the Caldwell

18 County Sheriff's Department.  I've served with that agency

19 ever since with the exception of 13 months.  In 2003, 2004 I

20 worked for the Hickory Police Department.  I began my

21 employment in the narcotics division in 1999 with the

22 sheriff's department.  And I've been with them ever since with

23 the exception of 2003, 2004 where I went to Hickory Police

24 Department.

25 Q.   You mentioned that you're a sergeant in the narcotics

1    unit.  How many people do you supervise?

2    A.    Four.

3    Q.    In your career can you give a rough estimate as to how

4    many drug-related investigations and arrests you've taken part

5    in.

6    A.    Several hundred.

7    Q.    And being in federal court, let me ask you, how many of

8    your investigations have been part of a federal task force?

9    A.    Probably close upwards to a hundred.

10   Q.    All right.  Now, among the drug cases that you've

11   handled, approximately how many have involved methamphetamine?

12   A.    Probably close to a hundred.

13   Q.    During the -- are you familiar with the term

14   "debriefing"?

15   A.    Yes, I am, sir.

16   Q.    Can you explain to the jury what it means to debrief an

17   individual.

18   A.    To debrief an individual can mean after you do an

19   operation, an undercover operation, you sit down with that

20   individual and you listen to their account of what actually

21   happened.  Or you talk to them about the knowledge that they

22   may know about a particular incident or information that

23   you're curious about and you ask them about that.

24   Q.    Approximately how many drug users have you debriefed?

25   A.    Hundreds.

1  Q.   And with regard to drug traffickers, distributors, about

2  how many have you debriefed in your career?

3  A.   In my career?  Hundreds.

4  Q.   Can you very briefly tell us, first of all, what is meth?

5  What is methamphetamine?

6  A.   Sure.  Methamphetamine is a Schedule II controlled

7  substance.  There are six schedules in North Carolina.  Meth

8  is a Schedule II.  It has no medicinal value.

9      In its purest form it resembles a crystal like substance,

10  shards of glass.  Hence, the street term crystal or glass.

11  And that type methamphetamine is traditionally or typically

12  manufactured in what they call super labs that's outsourced

13  outside the United States.

14      And then you have methamphetamine that you may be more

15  familiar with that's manufactured locally in what they call

16  the one pot or the shake and bake method where the

17  manufacturer, also known as the meth cook, places chemicals in

18  a single 2 liter bottle, mixes it, gets chemical reactions,

19  and then they have a finished product of methamphetamine

20  that's a lower grade meth.  It's not crystal.  It's more of a

21  white powder type substance.

22  Q.   How is methamphetamine taken?

23  A.   You can smoke it, you can inject it, and you can eat it

24  or snort it.

25  Q.   What's a typical dosage unit for methamphetamine?

JOHN BARBOUR - DIRECT

1  A.   About a tenth of a gram.

2  Q.   Let's talk about pricing.  How much would a single dose

3  of methamphetamine in Caldwell County cost?

4  A.   A single dosage unit for a single high would be around 30

5  to 50 bucks -- 30 to 50 dollars, excuse me.

6  Q.   Has it been roughly that range for the past few years?

7  A.   Yes, sir.

8  Q.   What other amounts are there above dosage units that

9  you're familiar with?

10 A.   Yes.  Methamphetamine is also sold in gram amounts, which

11 is typically around $120.  It's sold in 3.5-gram amounts which

12 is typically around $350.  It's also distributed in quarter

13 ounce amounts which is sold around $600.  Half ounce amounts

14 is sold typically in this area around 1,000 to 1,200 dollars.

15 And then you get to 1 ounce amounts which is the trafficking

16 level.  It's typically sold in this area around $2,000.

17 Q.   Officer Barbour, I'd like to show you a few photographs.

18 They'll only be visible to you, the judge, and the defense for

19 now.

20      First, is -- the following has been marked as

21 Government's Exhibit, for identification first, 1, Number 1,

22 Number 2, Number 3, Number 4, 13B, bravo, and 15B, bravo.

23      Do you recognize the individuals in those photographs?

24 A.   Yes, sir, I do.

25 Q.   How do you recognize them?

1   A.   I've had personal interaction with them professionally

2   through law enforcement dealings.

3   Q.   Okay.  Are they fair and accurate photographs of those --

4   the individuals with whom you've dealt with in your law

5   enforcement capacity?

6   A.   Yes, sir, they are.

7           MR. KAUFMAN:  Your Honor, at this point we'd move to

8   admit Exhibits 1 through 4, 13B, and 15B.

9           THE COURT:  Let them be admitted.

10          (Government's Exhibits Nos. 1, 2, 3, 4, 13B, and 15B

11  were received into evidence.)

12  Q.   All right.  First of all, who is in Exhibit 1?

13  A.   That is the defendant, Roger Franklin.

14  Q.   And when you say "the defendant," do you see him in court

15  today?

16  A.   Yes, sir, I do.  He's seated at the defense table beside

17  his attorney.

18          MR. KAUFMAN:  Your Honor, may the record reflect an

19  in-court identification of the defendant, Mr. Franklin.

20          THE COURT:  It will so reflect.

21          MR. KAUFMAN:  Thank you.

22  Q.   And Exhibit 2, who's that?

23  A.   That is Lisa Wentworth.

24  Q.   Exhibit 3?

25  A.   Terri Clark.

1    Q.    Exhibit 4?

2    A.    William Clyde Townsend, also known as Bones Townsend.

3    Q.    13B?

4    A.    Destiny Miller.

5    Q.    And 15B?

6    A.    Sheila Sipes.

7    Q.    All right.  Now, I'd like to turn your attention back to

8    September 3rd of 2013.  Did you take part in any investigative

9    operations that are relevant to Mr. Franklin's case on that

10   date?

11   A.    Yes, sir, I did.

12   Q.    Can you tell the jury what happened.

13   A.    Yes, sir.  On that date in question I was talking with an

14   informant that I had worked numerous times in the past that I

15   deemed reliable to law enforcement.  And on that occasion he

16   informed me of an individual by the name of Destiny Miller,

17   that he could arrange a drug deal concerning methamphetamine

18   with her.

19        And what's important to know is several days prior to

20   September the 3rd, we had tried to do some deals with Destiny

21   that did not materialize.  But one important thing we learned

22   from it was that she was not a main source but she could get

23   methamphetamine.  And that was particularly of interest to us

24   on September 3rd because we felt like she would probably bring

25   somebody with her, maybe her source for methamphetamine.

1    So on that day we had briefed with the informant and our

2  operational plan was to take her and anybody else that she was

3  with into custody once she showed up at a meeting place that

4  was agreed upon with the informant and we could confirm that

5  we had methamphetamine on scene with the informant.

6    That did happen.  Destiny showed up on scene in a '92

7  Dodge truck being driven by the defendant.  After they showed

8  up, there was some conversation.  I talked with the informant

9  by telephone.  He confirmed with me that there was

10  methamphetamine there, and I and two other agents went in and

11  took the defendant and Destiny into custody.

12  Q.  When you're referring to "the defendant" throughout your

13  testimony, you're talking about Mr. Franklin?

14  A.  Yes, sir.

15  Q.  Okay.  What happened after you took them into custody?

16  A.  We searched the truck and there was several packages of

17  methamphetamine found in the driver side door of the truck

18  inside the panel and then there was additional packages found

19  in the passenger side door of the vehicle.

20  Q.  Whose vehicle was it?

21  A.  It was being driven by Mr. Franklin.  It was in his

22  custody and care.

23  Q.  Did you -- in addition to -- well, can you describe in

24  more detail what you found behind the panels.

25  A.  Yes, sir.  Behind the passenger door panel of the

1    truck -- and this is a single cab.  It only has one door.  Was

2    two clear plastic baggies.  You may be more familiar with them

3    as jewelry bags.  They're about this big (indicating) and

4    there's a little Ziplock up top.  That had a crystal like

5    substance in it.  And then in the driver side door there was

6    six packages that had a crystal like substance in it.

7    Q.    Did you find any cash during the traffic stop?

8    A.    Yes, sir, there was cash found.

9    Q.    From whom?

10   A.    From Mr. Franklin.

11   Q.    Do you recall how much and where it was?

12   A.    It was on his person.  It was over $200.

13   Q.    All right.  I'd like to show you what has been marked as

14   Government's Exhibits 13A through H.  13B has been admitted,

15   but I'll go through the list.  13A, 13B, 13C, 13D, 13E, 13F,

16   13G, and 13H.

17        Do you recognize those photographs?

18   A.    Yes, sir.

19   Q.    What are they in general?

20   A.    Those are the photographs taken at the crime scene on the

21   September 3rd incident of the vehicle and of the evidence

22   seized.

23        MR. KAUFMAN:  Your Honor, we'd move to admit 13A

24   through H and publish them to the jury.  Obviously, 13B

25   already being admitted.

JOHN BARBOUR - DIRECT

1    THE COURT:  Let them be admitted.

2    MR. KAUFMAN:  Thank you, Your Honor.

3    (Government's Exhibits Nos. 13A, 13C, 13D, 13E, 13F,

4    13G, and 13H were received into evidence.)

5  Q.    Going back to 13A.  Who is that?

6  A.    That is the defendant, Roger Dale Franklin.

7  Q.    Okay.  We've already done 13B.  That's, I believe you

8  testified, Destiny Miller.

9  A.    Yes, sir.

10  Q.   13C.  What's that?

11  A.   That is the Dodge truck in question.

12  Q.   13D.  Is that a side view of the --

13  A.   Yes, that is the passenger side photograph of the Dodge

14  truck.

15  Q.   13E.

16  A.   That is the -- a photograph of the driver side door

17  showing the door panel.

18  Q.   And I'm enlarging a portion near the middle.  Can you

19  tell us what that's showing.

20  A.   Yes.  That's showing the door panel I earlier described

21  on the driver side door from where the packages of

22  methamphetamine was recovered from.

23  Q.   And I believe your testimony was there were six bags --

24  six baggies on that side?

25  A.   Yes.  Let me clarify.  There was seven in the photograph.

JOHN BARBOUR - DIRECT

1   The six were contained in one package.

2   Q.   13F.

3   A.   Yes, sir, that's a photograph of the passenger side door

4   panel containing the two packages of crystal like substance,

5   methamphetamine.

6   Q.   And I'm enlarging a portion in the middle.  Is that what

7   you're referring to?

8   A.   Yes, sir, it is.

9   Q.   13G.

10  A.   Yes, that's a photograph of the packages retrieved,

11  seized from the driver side door.

12  Q.   And is that back at the Caldwell County Sheriff's Office

13  that this photograph was taken?

14  A.   I'm sorry, I didn't hear the question.

15  Q.   13G, was that taken when the evidence had been marshaled

16  back at the --

17  A.   Oh, yes, sir, it was.  Yes.

18  Q.   And 13H.

19  A.   Yes, sir, that photograph was taken at the Caldwell

20  County Sheriff's Office.

21  Q.   And are G and H from the driver side and passenger side

22  respectively?

23  A.   Yes, it is.

24  Q.   All right.

25          MR. KAUFMAN:  Your Honor, at this time I would like

JOHN BARBOUR - DIRECT

1    to read some stipulations.

2           THE COURT:  Yes, sir, you may.

3           Now, members of the jury, when a -- when the

4    attorneys have agreed to stipulate to certain facts, that

5    means that neither party contests those as being facts and

6    therefore the jury must accept the facts stipulated even

7    though nothing may be said about those facts one way or

8    another other than the stipulation.

9           MR. KAUFMAN:  Thank you, Your Honor.  I'll be

10   reading from what have been marked as Government's Exhibits 5

11   and 6.  We will not be publishing them to the jury, but we're

12   marking them as exhibits for future purposes.

13          THE COURT:  All right, sir.

14          MR. KAUFMAN:  The substances obtained by law

15   enforcement in this case, to include on July 6, 2013, on

16   August 19th, 2013, September 3rd, 2013, and November 20th of

17   2013, were -- which were suspected to be methamphetamine, were

18   tested by an expert forensic chemist and determined to be, in

19   fact, methamphetamine.  In making this stipulation, defendant

20   Franklin is not admitting that he distributed or possessed

21   with intent to distribute methamphetamine or any controlled

22   substance or conspired to do the same in this case.  In other

23   words, the defendant merely agrees that the laboratory tests

24   prove that the materials seized are methamphetamine.  The

25   defendant specifically denies the drug charges in this case.

1    THE COURT:  Now, members of the jury, the parties

2    enter into stipulations from time to time during a trial to

3    save the Court and the parties the time it would otherwise

4    take to prove facts about which there is no dispute.

5    Thank you.

6    Q.   (By Mr. Kaufman:)  All right.  Sergeant Barbour, at that

7    point in time, about how many different investigations were

8    you actively working on, if you can remember?

9    A.   Counting on the state level, actively a dozen or so.

10   Q.   Okay.  With regard to this investigation, what did you do

11   next?

12   A.   The next thing I did was on November the 20th is I wrote

13   a tracking order and presented it to a superior court judge

14   and it was signed.  And a tracking order is an order that

15   gives law enforcement the authority to put a GPS tracking

16   device on a vehicle.  And that's exactly what I did.

17   Mr. Franklin's vehicle in the September 3rd case was seized by

18   the sheriff's office and impounded at our impound lot.

19   Q.   Okay.  So did you encounter Mr. Franklin a second time?

20   A.   Yes, sir, I did.  That would have been on November the

21   20th.

22   Q.   Tell us what happened.

23   A.   On that day I was monitoring the tracking device at the

24   computer at my work station at work and I had seen where the

25   vehicle was making rounds -- or traveling in the Marion area.

1    And I did a -- previously did an interview and learned from

2    that interview that Mr. Franklin's potential source of

3    methamphetamine was in the Marion area.

4         I also knew that Mr. Franklin did not have a valid

5    driver's license.

6         So later that day on November the 20th, with the aid of

7    electronic surveillance, myself and two other agents set up at

8    an intersection.  Mr. Franklin drove by.  Once it was

9    confirmed he was driving, he was pulled over.

10   Q.   What happened after the stop?

11   A.   Mr. Franklin was in the company of Ms. Sheila Sipes and

12   they were detained.  We learned through that vehicle stop and

13   that investigation that Ms. Sipes had a package of

14   methamphetamine down the front of her pants and two more

15   packages of a controlled substance in her bra area.

16   Q.   Did you, in fact, seize those drugs?

17   A.   Yes, sir, I did.

18   Q.   Do you recall approximately how much in weight those

19   drugs were?

20   A.   Yes, sir.  It was 13.6 grams of methamphetamine.

21   Q.   All right.  Did you also find any cash on that date?

22   A.   Yes, there was over $1,100 in cash seized from the person

23   of Mr. Franklin.

24   Q.   I'd like to show you what have been marked as

25   Government's Exhibits 15A through C for identification

1  purposes.  15B obviously has already been admitted.

2        Do you recognize 15A, 15B, and 15C?

3  A.   Yes, sir, I do.

4  Q.   And what are they?

5  A.   The first photograph is the picture of -- or photograph

6  of the defendant, Roger Franklin.  The second photograph was

7  of Sheila Sipes.  And 15C, the third photograph shown to me is

8  a photograph of the evidence seized that date.

9  Q.   All right.

10        MR. KAUFMAN:  Your Honor, we move to admit and

11  publish 15A, B, and C.

12        THE COURT:  Let them be admitted.

13        MR. KAUFMAN:  Thank you, Your Honor.

14        (Government's Exhibits Nos. 15A and 15C were

15  received into evidence.)

16  Q.   So I believe that your testimony was that 15A, that was

17  the photograph from the arrest on that date, November 20th,

18  2013?

19  A.   Yes, sir.

20  Q.   And 15B, same for Ms. Sipes?

21  A.   Yes, sir.

22  Q.   15C, can you describe for the jury what you're seeing

23  here.

24  A.   Yes.  There is one package of a crystal like substance

25  tied off, and then there is another cellophane package that

1  contains two smaller packages of a light colored substance

2  contained inside it.

3  Q.   And based on your training and experience, what's the

4  significance of the packaging in the lower half?

5  A.   It's packaged for distribution.

6  Q.   Why do you say that?

7  A.   Because it's in more than one package.  Normally,

8  typically you see personal use would just be one package.

9  When you see a package, even though it's a small amount, if

10 it's packaged individually throughout, it usually determines

11 that it's for distribution.

12 Q.   I'm sorry if you've already described this.

13 Approximately how much methamphetamine was seized on that

14 date?

15 A.   13.6 grams.

16 Q.   So based on your earlier testimony, would that roughly

17 be, you know, over 130 dosage units?

18 A.   Oh, yes, sir.

19      MR. KAUFMAN:  Thank you, Your Honor.  Nothing

20 further.

21      THE COURT:  Mr. Thorsen.

22      MR. THORSEN:  Thank you, Your Honor.

23                      CROSS EXAMINATION

24 BY MR. THORSEN:

25 Q.   Good morning, Investigator Barbour.

1  A.   Good morning, sir.

2  Q.   Investigator Barbour, you said you've debriefed hundreds

3  of drug users.

4  A.   Throughout my career, yes, sir.

5  Q.   Are all -- were all of them truthful to you?

6  A.   I would say not a hundred percent of them.

7  Q.   Detective Barbour, September 3rd, 2013, you were part of

8  an observation of a controlled buy from Destiny Miller; is

9  that correct?

10 A.   Yes, sir.

11 Q.   Now, there had been a previous controlled buy from

12 Destiny Miller a couple weeks earlier.  Were you familiar with

13 that?  August 15 there was a controlled buy from her.

14 A.   We -- we had tried to do a deal with her a few days

15 before, but it did not materialize.

16 Q.   The one on August 14th didn't materialize, but you had

17 one on August 15th, had you not?

18 A.   There was another deal that she was present, but one of

19 my undercover agents actually dealt with another individual.

20 That may be the one you might be talking about, sir.

21 Q.   Investigator Barbour, in a controlled buy you have

22 various officers there to observe what happens; is that

23 correct?

24 A.   Yes, sir.

25 Q.   And you can have cameras there to take pictures of what

1  happens.

2  A.    Not always.

3  Q.    But you can have cameras there to take pictures, can't

4  you?

5  A.    There are sometimes in situations you could.    Other

6  situations dictate you may not be able to use all those types

7  of equipment.

8  Q.    The person who's doing the controlled buy, that's usually

9  either a confidential informant or an undercover officer?

10  A.    Yes.

11  Q.    And they can be wired for sound.

12  A.    Yes.

13  Q.    The controlled buy on September 3rd, Destiny Miller was

14  the person who was supposed to be bringing the drugs; is that

15  correct?

16  A.    Yes.

17  Q.    And she arrived where the sale was supposed to take

18  place.

19  A.    Yes.

20  Q.    And this was with a confidential informant?

21  A.    Yes, sir.

22  Q.    Okay.    Detective -- Investigator Barbour, the -- Destiny

23  Miller got out of the car after she talked to the confidential

24  informant, did she not?

25  A.    Yes.

1  Q.    And she and the confidential informant went inside his

2  apartment.

3  A.    Yes.

4  Q.    At some point Mr. Franklin got out of the car; is that

5  correct?

6  A.    When we approached during the takedown, he was outside

7  the vehicle.    Just outside the vehicle.

8  Q.    Had he gone back behind another building to relieve

9  himself?

10 A.    I believe that's correct, yes, sir.

11 Q.    And then he wasn't at the car when you say there was this

12 takedown.

13 A.    He was in the near vicinity very, very close.

14 Q.    Investigator Barbour, Destiny Miller and the confidential

15 informant had come out of the apartment and gone back to the

16 truck while Roger Franklin was not there; is that correct?

17 A.    They had come out of the apartment, yes, and returned

18 back to the vehicle.

19 Q.    And one was leaning inside one window and one was leaning

20 inside the other truck window; is that correct?

21 A.    Are you referring to Mr. Franklin and Destiny?

22 Q.    No, I'm referring to the confidential informant and

23 Destiny.    Mr. Franklin, you said, was somewhere away from the

24 truck.

25 A.    I don't know if the informant was leaning in the window

1   or not.

2   Q.   Do you recall the informant telling you he wasn't sure --

3   well, first off, the informant telling you when he went in the

4   apartment, Destiny Miller showed she had some crack -- some

5   meth with her; is that correct?

6   A.   Repeat that again.

7   Q.   When the confidential informant and Destiny Miller went

8   in the apartment --

9   A.   Yes, sir.

10  Q.   -- she showed him some meth, some drugs.  She had the

11  drugs.

12  A.   I learned from the informant when I placed a telephone

13  call to him he had already returned from the apartment and was

14  outside by the vehicle.  That's when I first talked with the

15  informant and he said there was meth on scene.

16  Q.   Okay.

17  A.   Yes, sir.

18  Q.   You don't recall him going in and her showing him some

19  meth inside the apartment?

20  A.   He did confirm there was meth on the scene.

21  Q.   Okay.  Do you remember the confidential informant telling

22  you after they came out of the apartment he wasn't sure if

23  Destiny Miller hadn't just hidden some drugs in the panel of

24  the doors; is that correct?

25  A.   He did tell me she went back to the truck and he thought

JOHN BARBOUR - REDIRECT

1  she could have hid it in the vehicle because we didn't find

2  any methamphetamine on her after the takedown.

3  Q.   You never found any methamphetamine on Roger Franklin at

4  any point, did you?

5  A.   On that date not on his person, no, sir.  In his vehicle.

6  Q.   Did the confidential informant, was he paid money for

7  this?

8  A.   Yes.

9  Q.   Investigator Barbour, you said on November 20th you also

10  stopped Mr. Franklin and he had Sheila Sipes in the car with

11  him.

12  A.   That is correct.

13  Q.   And Sheila Sipes had methamphetamine on her person.

14  A.   Yes.

15  Q.   Mr. Franklin did not have any meth on his person.

16  A.   Not on his person, no, sir.

17  Q.   Did he have any meth in his car he was driving?

18  A.   Not that we found.

19       MR. THORSEN:  No other questions.

20                    REDIRECT EXAMINATION

21  BY MR. KAUFMAN:

22  Q.   Sergeant Barbour, you were asked about truthfulness of

23  people you have debriefed who are involved in drug

24  trafficking.  Can you explain to us what corroboration is, how

25  that plays out in your investigations.

1    A.    Yes, sir.  Corroboration occurs when an individual may

2    tell me particular information about someone and we're able to

3    corroborate it.  For example, they may provide us information

4    that this person sells or distributes methamphetamine.  Well,

5    how do I corroborate that?  I corroborate it by controlled

6    buys, buy/bust sting operations where I've actually recovered

7    methamphetamine from that person.  So that tells me that the

8    person I debrief is being truthful.  Their information is

9    indeed corroborated by that fact.

10   Q.    Do you believe what an informant tells you if you're

11   unable to corroborate it?

12   A.    I'm sorry, sir?

13   Q.    Do you believe what the informant tells you if you're

14   unable to corroborate it?

15   A.    I've had some informants that are very reliable and they

16   may provide information about a particular person and I may

17   not be able to per se corroborate it with controlled buys.

18   But through their history, if they're deemed to be reliable

19   and I haven't had any issues with them, yes, in that case I do

20   believe them.

21   Q.    You were asked about the use of -- the defense lawyer was

22   asking you questions about the use of cameras during

23   operations and you were trying to explain that sometimes you

24   do, sometimes you don't.  Can you explain to the jury why you

25   wouldn't under certain circumstances.

1  A.   Sure.  Certain circumstances where you may not want to

2  use a camera would be if you were trying to protect the

3  identity of a very reliable confidential informant.

4  Anything -- part of the investigation is used as discovery.

5  And if you're trying to protect the informant, you may not

6  want to consider using a video camera in that instance.

7       And a lot of times you may not be able to use a camera in

8  the situation, particularly if you're meeting outside.  We're

9  limited with the equipment that we do have and it's -- it may

10  not always be feasible to set up camera equipment to record

11  transactions.  And sometimes transactions, you think they're

12  going to happen here and they change.  Locations move and the

13  deal actually happens at another place.

14  Q.   Has your law enforcement team ever been on surveillance

15  and been so-called made by the targets of the investigation?

16  A.   Absolutely.

17  Q.   What happens then?

18  A.   If the suspect makes us or suspects that we are in the

19  area, the deal doesn't happen a lot of times and the

20  informant -- our informant is burned.

21  Q.   You were also asked by the defense lawyer about the use

22  of body wires.

23  A.   Yes.

24  Q.   Are there any risks involved in the use of body wires?

25  A.   Yes, sir.

MARTIN CRISP - DIRECT

1  Q.   Can you explain to the jury what some of them are.

2  A.   Sure.  I have through experience, law enforcement

3  experience in the past, had informants wear what they call a

4  body wire and the target find it on them.  There has been

5  instances where the target is suspicious of the informant and

6  they may ask to pat them down and the informant allows it and

7  they get caught with it and then that can be a serious

8  potential hazard for the informant and for law enforcement.

9        MR. KAUFMAN:  Thank you.  Nothing further, Your

10  Honor.

11        MR. THORSEN:  Nothing further.

12        THE COURT:  All right.  You may step down.

13        THE WITNESS:  Thank you, sir.

14        (Witness stepped down.)

15        MR. KAUFMAN:  Your Honor, the United States calls

16  Lenoir Police Department Officer Martin Crisp.

17        MARTIN SHAW CRISP, GOVERNMENT WITNESS, SWORN,

18                  DIRECT EXAMINATION

19  BY MR. KAUFMAN:

20  Q.   Good morning.

21  A.   Hey, sir.

22  Q.   Sir, if you would, tell us your full name and spell your

23  last name for the record.

24  A.   I'm sorry, can you speak up.

25  Q.   Can you state your full name and spell your last name for

1  the record.

2  A.   Yes.  My full name is Martin Shaw Crisp.  Last name is

3  C-r-i-s-p.

4  Q.   What do you do?

5  A.   I'm a corporal for the patrol division of Lenoir Police

6  Department.

7  Q.   How long have you been in law enforcement?

8  A.   Approximately four and a half years.

9  Q.   What did you do before that?

10 A.   I was in the military.

11 Q.   How long were you in the military?

12 A.   Almost ten years.

13 Q.   What branch?

14 A.   United States Marine Corps.

15 Q.   Now, I'd like to turn your attention to August 19th of

16 2013.  Do you recall being involved in a methamphetamine

17 seizure that date?

18 A.   Yes, sir, I do.

19 Q.   Can you please tell the jury what happened.

20 A.   On that date approximately 2235 hours, 10:35 at night, I

21 assisted another patrol officer that worked the same shift

22 with me on a traffic stop.  He had pulled over a red in color

23 Ford Mustang convertible with a brown top.

24      Upon my arrival I observed that vehicle.  I saw a -- it

25 was occupied by a white male and a white female.  White female

1  being the driver, white male being the passenger.

2      As I approached my fellow officer's vehicle, I stood by

3  on the driver's side while he conducted his enforcement action

4  which was writing a citation at that point in time.

5      While I was standing by with the vehicle, I observed the

6  vehicle while the other officer, as I said before, was

7  conducting his enforcement action.  I noticed that the male

8  and female were talking.  I couldn't, of course, hear what

9  they were saying, but I could tell that they were involved in

10 some sort of conversation.

11 Q.   Officer Crisp, if I can stop you for just a brief moment.

12 A.   Yes, sir.

13 Q.   Who were the male and the female?

14 A.   The male is Roger Franklin and the female...

15 Q.   And I'll just note for the record, are you now for the

16 female's name refreshing your recollection?

17 A.   No, I -- I'm sorry, sir.

18 Q.   Are you now -- I just asked you what the female's name

19 was and you looked down.  Are you refreshing your

20 recollection?

21 A.   I am.  I am.

22 Q.   With notes?

23 A.   With notes, yes, sir.

24 Q.   Okay.  And these are basically -- these are notes --

25 basically the report that you drafted --

1   A.   It is.

2   Q.   -- close in time to this seizure?

3   A.   Yes, sir, it is.

4   Q.   All right.  So, please.

5   A.   The female's name is Lisa Dawn Wentworth.  As I said

6   before, I was observing the vehicle while the other officer

7   was conducting his enforcement action.  I noticed that the

8   male and female were involved in some sort of conversation.  I

9   could tell that the female was looking left and right quite

10  frequently.

11       Once Officer Greene and I reapproached the vehicle,

12  Officer Greene started to explain his citation to the driver.

13  And I was positioned on the passenger's side of the vehicle.

14  And as I do with every traffic stop that I assist on,

15  especially at night in low light conditions, I shine my

16  flashlight inside so the occupants' hands and anything within

17  the reachable compartment can be seen for our safety and

18  others.

19       I could hear Officer Greene ask for consent to search the

20  vehicle.  I could not hear what the driver's response was.

21  But immediately after he asked that question, I saw her look

22  towards the center console of the vehicle.  I tried to get

23  Cody Greene's attention to let him know she was looking at the

24  center console.  I couldn't get his attention because he was

25  focused on the driver.

1    He then asked the driver to get out of the vehicle.
2  Previously he had informed me that he thought she was under
3  the influence of possible alcohol.  At that point in time, she
4  did step out of the vehicle.  He conducted a roadside breath
5  test on her.  The results showed no indication of presence of
6  alcohol.

7    He then started to do a protective frisk of her and he
8  advised me that narcotics were found and he advised it was a
9  clear rock like substance.

10    At that point in time I'm standing by with -- on the
11 passenger side of the vehicle and we get the -- at that point
12 in time Officer Greene handed me a .38 caliber revolver to
13 secure and to clear.  Once I did that --
14 Q.   And Officer Crisp, just to confirm.  That wasn't a
15 service weapon.  That was a weapon found in the vehicle; is
16 that correct?
17 A.   Yes, sir.  Yes, that was a revolver that was found in the
18 center console of the Mustang in question.

19    Once I cleared it I secured it in my patrol vehicle.

20    And at that point Officer Greene got Mr. Franklin out of
21 the vehicle and I started to conduct a search of the vehicle.
22 I started in the front driver side floorboard as I always do
23 on every vehicle that I search and I searched in a systematic
24 manner.  Upon completion of my search, all that I found as far
25 as contraband in that vehicle was a bag of syringes which were

1  also in the center console.  The search resulted in no more
2  contraband or weapons found.

3      At that point in time, I stood by with the vehicle and I
4  called my sergeant, Sergeant Mark Marlowe, at the time and
5  notified him of the situation just to keep him up to speed on
6  what we were doing and what we had.  He advised that he was
7  going to be en route.

8      And at that point in time, Officer Greene took
9  Mr. Franklin to use the restroom over by a tree line.  I could
10  see them walk off.  It was very dark at that point in time,
11  but I could see them walking.  They both crossed a ditch on
12  the right side of the road.  I could see Mr. Franklin stumble.
13  At that point I didn't think much of it.  My responsibility
14  was maintaining security of the vehicle.

15      As they returned to my location, Officer Greene informed
16  me that a large amount of what appeared to be crystal meth
17  fell out of Mr. Franklin's pants.

18                MR. THORSEN:  Objection, Your Honor.
19                THE WITNESS:  And at that point in time --
20                THE COURT:  Overruled.
21  Q.   Please continue.
22  A.   And at that point in time --
23  Q.   Based on what Officer Greene told you, what did you do?
24  A.   At that point in time, once he informed me of that, I
25  could shine -- I shined my flashlight over to where he said

1  they were and I could clearly see several bags of what

2  appeared to be crystal methamphetamine laying on the ground.

3  At that point in time, I placed Mr. Franklin into custody with

4  handcuffs and he was escorted to my vehicle, my patrol vehicle

5  by Officer Greene.

6      Then once Sergeant Marlowe arrived -- prior to being a

7  patrol sergeant, he was a narcotics detective.  So I retrieved

8  a field testing kit for methamphetamine from my patrol vehicle

9  and handed it to Sergeant Marlowe, which he tested.  I didn't

10 witness any of the testing procedures or the results of that

11 testing.

12 Q.   Officer Crisp, did you take photographs from the scene?

13 A.   I did assist in some of the photographing --

14 Q.   Okay.

15 A.   -- of the evidence that was on the ground that Officer

16 Greene told me had fallen out of Mr. Franklin's shorts.

17 Q.   And can I ask you about the location of the photographs

18 that you took.  Was it in the same area where you saw

19 Mr. Franklin having walked towards the tree line?

20 A.   Yes, sir.  It had not been moved.  It had not been

21 touched.

22 Q.   All right.  I'd like to show you what have been marked as

23 Government's Exhibits 11A, 11B, and 11C.

24 A.   Yes, sir.

25 Q.   Do you recognize -- recognize those three photographs?

MARTIN CRISP - DIRECT

1   A.   Yes, sir, I do.

2   Q.   Did you take any of them?

3   A.   At this point in time, I don't recall which ones I took.

4   Q.   Okay.  But you recognize those as fair and accurate

5   photographs from the scene on --

6   A.   Yes, sir.

7   Q.   -- August 19th --

8   A.   Yes, sir.

9   Q.   August 19th, 2013?

10  A.   Yes, sir, I do.

11  Q.   All right, sir.  Thank you.

12          MR. KAUFMAN:  Your Honor, we move to admit and

13  publish 11A, 11B, and 11C.

14          THE COURT:  Let them be admitted.

15          MR. KAUFMAN:  Thank you, Your Honor.

16          (Government's Exhibits Nos. 11A, 11B, and 11C were

17  received into evidence.)

18  Q.   All right.  If you could tell us, what's 11A showing?

19  A.   A set of scales up there towards the top, towards the

20  windshield wiper.  Of course, two pocket knives.

21  Q.   Okay.  And then going to 11 -- and I'm sorry, just to --

22  before I go to 11B.  11A, I'm now increasing the size of a

23  portion of the image.  Is this what your testimony was was the

24  set of digital scales?

25  A.   Yes, sir, those are digital scales.

1  Q.   11B.

2  A.   That is a .38 caliber revolver that Officer Greene handed

3  to me that he found in the center console of the red Mustang.

4  He handed it to me to clear and secure it.

5       MR. KAUFMAN:  And Your Honor, at this time I'd like

6  to read another portion of the stipulations that are contained

7  in Exhibit 5.

8       THE COURT:  You may.

9       MR. KAUFMAN:  Thank you, Your Honor.

10      Defendant Franklin has been previously convicted of

11 a crime punishable by imprisonment for a term exceeding one

12 year; however, it related to driving.  It had nothing to do

13 with drugs, firearms or the charges in the current case

14 pending against him.

15      At the time of the offenses charged in the current

16 pending case, the defendant's felony conviction had not been

17 expunged or set aside and he had not been pardoned nor had his

18 civil rights restored.

19      Furthermore, the handgun recovered on August 19,

20 2013, an Interarms .38 Special revolver was manufactured

21 outside the State of North Carolina and was therefore in and

22 affecting interstate and foreign commerce.

23      Further still, a handgun in this case is a "firearm"

24 as defined under 18, U.S. Code, Section 921(a)(3).

25      That all said, defendant Franklin specifically

1  denies the other elements of the firearms charges, including

2  the allegation that he knowingly possessed the firearm in this

3  case.  He notes that it was Lisa Wentworth, the driver of the

4  vehicle, who directed law enforcement to the location in the

5  vehicle where it was located and she told the police on scene

6  that she had purchased it for her son's birthday.

7  Q.   I'd like to next turn to 11C.

8       Officer Crisp, if you can tell us what this is showing.

9  A.   The photograph here, that shows the individually packaged

10 plastic bags of what appear to be crystal meth just across the

11 ditch where I previously stated that Mr. Franklin had stumbled

12 while Officer Greene was taking him to use the restroom.  The

13 bags had not been touched or moved until after the photographs

14 were taken and they were properly processed by my sergeant and

15 Officer Greene.

16      MR. KAUFMAN:  Thank you.  Nothing further, Your

17 Honor.

18                    CROSS EXAMINATION

19 BY MR. THORSEN:

20 Q.   Good morning, Officer Crisp.

21 A.   Good morning, sir.

22 Q.   Officer Crisp, you arrived on the scene where Officer

23 Greene had made a traffic stop.

24 A.   Yes, sir.

25 Q.   Okay.  And were you able to smell alcohol coming from the

1   vehicle?

2   A.   No, sir, I was not.

3   Q.   Were you able to smell alcohol on Roger Franklin?

4   A.   No, sir.

5   Q.   Did Roger Franklin appear drunk to you?

6   A.   He did not.

7   Q.   Officer Crisp, if we could go back to Exhibit Number 11B.

8        This is the gun that was found in the car; is that

9   correct?

10  A.   Yes, sir.

11  Q.   And the gun was found on the driver side of the car

12  between the driver seat and the center console.

13  A.   From what I was told it was found in the center console.

14  Q.   Okay.

15  A.   I did not actually witness where the weapon was.  It was

16  handed to me by another officer to secure and clear.

17  Q.   So you don't know where this gun was found.

18  A.   I know it was in the vehicle.

19            MR. THORSEN:  Mr. Kaufman, if we could have Exhibit

20  11A.

21  Q.   Officer Crisp, this is a picture of all of -- or some of

22  the evidence that was found that night; is that correct?

23  A.   Yes, sir.

24  Q.   Do you know where the digital scales were found?

25  A.   They were found in the purse of Ms. Wentworth.

MARTIN CRISP - CROSS

1  Q.   Do you know where the -- where the -- now, is some of

2  this methamphetamine?

3  A.   That bag right there, it was -- I did not find that in

4  the purse.

5  Q.   But that was found in Lisa Wentworth's purse?

6  A.   I was advised that was found on her person in one of her

7  pockets.

8  Q.   So the digital scales and the drugs in this picture were

9  not found on Mr. Franklin, were they?

10 A.   That's correct, sir.

11 Q.   And Officer Crisp, you did not see the bags that were on

12 the ground, you didn't see them fall out of Mr. Franklin's

13 pants, did you?

14 A.   No, I did not see them fall out of his pants.

15 Q.   Okay.

16 A.   At that point in time my priority was the vehicle.

17 Q.   Officer Crisp, did you ever search Mr. Franklin that

18 night?

19 A.   No, I did not.

20 Q.   Did you see Officer Greene search him that night?

21 A.   No, I did not.

22          MR. THORSEN:  No other questions.

23          MR. KAUFMAN:  Nothing further, Your Honor.

24          THE COURT:  You may step down.

25          THE WITNESS:  Thank you.

1          (Witness stepped down.)

2          MR. KAUFMAN:  Next, Your Honor, the United States

3    calls Morganton Police Department Officer Stacy Huffman.

4          STACY HUFFMAN, GOVERNMENT WITNESS, SWORN,

5                    DIRECT EXAMINATION

6    BY MR. KAUFMAN:

7    Q.   Good morning, ma'am.

8    A.   Good morning.

9    Q.   If you would, please state your full name and spell your

10   last name for the record.

11   A.   Stacy Jane Huffman, H-u-f-f-m-a-n.

12   Q.   And ma'am, what do you do?

13   A.   I am a public safety officer with Morganton Public

14   Safety.

15   Q.   How long have you been in law enforcement?

16   A.   Five years.

17   Q.   And in those five years, how many of them have involved

18   the investigation or arrest of drug-related offenses?

19   A.   Over five hundred.

20   Q.   I'd like to turn your attention to July 6 of 2013.  Were

21   you involved in a stop and an arrest on that date?

22   A.   Yes, sir.

23   Q.   Can you tell us what happened.

24   A.   My shift was conducting a license checking station at

25   North Green Street and Sanford Drive.  Me and another officer

1  were standing on a bridge whenever a vehicle approached.  We

2  began talking to the driver of the vehicle.

3  Q.   Then what happened?

4  A.   The driver of the vehicle gave the name of Bradley

5  Coffey.  Upon a DMV check it was determined the driver was not

6  who he said he was compared to the DMV picture.

7      At that point I began assisting this officer.  Walked

8  over to the passenger side of the vehicle in which I come in

9  contact with a Roger Franklin and a Melissa Watson.

10 Q.   All right.  What happened -- when you say you made

11 contact, can you describe exactly what happened.

12 A.   I began asking them both for their license and ID so I

13 could see if they actually were a licensed driver.

14 Q.   Were they still sitting in the vehicle?

15 A.   Yes, sir.

16 Q.   Then what happened, Officer?

17 A.   I began speaking with Franklin.  Franklin advised me that

18 he did -- his window did not work; that he was going to have

19 to open his door to hand me his license.

20 Q.   Did he?

21 A.   Yes.  At which point I observed an open container of

22 alcohol which was a Coors Light can in a koozie seated

23 between -- beside his right foot in the passenger door.

24 Q.   What happened next?

25 A.   I asked him if he would step out of the vehicle.  As he

1 was stepping out, I could see what appeared from my training

2 and experience to be the barrel of a gun protruding out from

3 underneath the passenger seat. At which point I asked

4 Franklin to place his arms behind his back and detained him

5 for my safety.

6          MR. KAUFMAN: And Your Honor, it might make sense to

7 read the remainder of the stipulations that are contained in

8 Exhibit 6.

9          THE COURT: Yes, sir, you may.

10          MR. KAUFMAN: Thank you, Your Honor.

11          The handgun recovered on July 6, 2013, a Taurus

12 handgun, was manufactured outside the State of North Carolina

13 and were therefore in and affecting interstate and foreign

14 commerce. Further still, the handgun in this case is a

15 "firearm" as defined under the United States code. However,

16 as stated in the other set of stipulations, defendant Franklin

17 specifically denies the other elements of the firearm charges,

18 including the allegation that he knowingly possessed the

19 firearm in this case. He notes that he was a passenger in the

20 vehicle and not the owner of the vehicle and that the handgun

21 was located under the seat.

22 Q.   So Officer Huffman, what happened after you found the

23 Taurus handgun?

24 A.   I had dispatch check to see if Franklin was a convicted

25 felon, which they confirmed. I began a more thorough search

1   of the vehicle to make sure there was no other weapons.  At

2   which point I come across a clear plastic baggie that had six

3   individual baggies that contained a crystal like substance

4   that once field tested tested positive for methamphetamine.

5   Q.   And where specifically was the bag with the baggies

6   inside of it located?

7   A.   It was between the center console and the passenger seat.

8   Q.   And who was in that passenger seat?

9   A.   Mr. Franklin.

10  Q.   Did you -- was any cash located on that date?

11  A.   Yes, there was some cash located on Mr. Franklin.

12  Q.   How much?

13  A.   A total of $2,945 cash.

14          MR. KAUFMAN:   Thank you.  Nothing further, Your

15  Honor.

16                    CROSS EXAMINATION

17  BY MR. THORSEN:

18  Q.   Is it Officer Huffman?

19  A.   Yes, sir.

20  Q.   Ms. Huffman, Roger Franklin -- it wasn't his car.  It was

21  a truck or a car that was --

22  A.   It was a car, passenger car.

23  Q.   And you're saying it was not his car.

24  A.   That's correct.

25  Q.   And the -- you found drugs when you searched the car.

LISA WENTWORTH - DIRECT

1  A.   That's correct.

2  Q.   And these were in the back seat?

3  A.   No, sir.

4  Q.   Where were the drugs found?

5  A.   The drugs were between the front passenger seat and the

6  center console.

7  Q.   And that's something that someone in the back seat could

8  reach?

9  A.   Not how it was positioned.  It was positioned in front of

10 the seat belt.

11          MR. THORSEN:  No other questions.

12          MR. KAUFMAN:  No further questions, Your Honor.

13          THE COURT:  Okay.  You may step down.

14          (Witness stepped down.)

15          MR. KAUFMAN:  Your Honor, our next witness is Lisa

16 Wentworth.  She'll be coming out with the marshals.

17          THE COURT:  All right.  Thank you.

18          MR. KAUFMAN:  Thank you, Your Honor.

19          LISA DAWN WENTWORTH, GOVERNMENT WITNESS, SWORN,

20                     DIRECT EXAMINATION

21 BY MR. KAUFMAN:

22 Q.   Good morning.

23 A.   Good morning.

24 Q.   Ma'am, if you would, please state your full name for the

25 record.

LISA WENTWORTH - DIRECT

1    A.    Lisa Dawn Wentworth.

2    Q.    Ms. Wentworth, are you here having pled guilty to a

3    conspiracy involving distribution and possession with intent

4    to distribute methamphetamine?

5    A.    Yes.

6    Q.    And ma'am, how much methamphetamine did you plead to?

7    A.    1,500 to 5,000 grams.

8    Q.    I'd like to show you what's been marked as Government's

9    Exhibit 16 for identification purposes.  Are you able to see

10   that on the screen?

11   A.    Yes.

12   Q.    And do you recognize what this is?

13   A.    Yes.

14   Q.    What is it?

15   A.    That's my plea agreement.

16   Q.    And just to confirm, going to the last page, page 8, do

17   you see your signature on that page?

18   A.    Yes.

19   Q.    Thank you.  Do you see any of your co-conspirators in the

20   courtroom today?

21   A.    I do.

22   Q.    Who do you see?

23   A.    Roger Franklin.

24   Q.    Can you tell us where he is and what he's wearing.

25   A.    He's right there.  I can't -- dark jacket.

LISA WENTWORTH - DIRECT

1    MR. KAUFMAN:  Okay.  Your Honor, may the record
2    reflect a correct in-court identification of the defendant.
3    THE COURT:  It will so reflect.
4    MR. KAUFMAN:  Thank you, Your Honor.
5    Q.  Ms. Wentworth, can you tell us, when did you first meet
6    Mr. Franklin?
7    A.  I met him when I was 16.
8    Q.  How did you meet him?
9    A.  He was best friends with my cousin.
10   Q.  Now, you stated that you and he were in the same
11   conspiracy, the methamphetamine conspiracy.  Can you tell us
12   when that started.
13   A.  It started around the end of 2013.  Probably October,
14   November of 2013.
15   Q.  Tell us how that happened.
16   A.  We were occasional drug users and the guy we were dealing
17   drugs with was not a good dealer, and I mentioned to Roger
18   that there was a job opening in the town jokingly.  And he
19   said that he had connections and he could get good
20   connections.  And I told him to prove it, and he did.
21   Q.  When you say "he did," what do you mean?
22   A.  He proved that he had connections.  We started buying
23   methamphetamines then and selling them.
24   Q.  Let's take a step back.  Who was this individual you said
25   who was the not so successful drug dealer that you and he were

1  getting methamphetamine from?

2  A.   His name was Bones.  William Townsend.

3  Q.   I'd like to show you what's been admitted as Government's

4  Exhibit 4.  Do you recognize that?

5  A.   Yeah, that's him.

6  Q.   Okay.  And when you were buying from Mr. Townsend, what

7  kind of quantities were you purchasing from him?

8  A.   At that time we were just occasional users.  We were

9  buying like a quarter bag at a time.

10  Q.   Quarter gram?

11  A.   Yeah.

12  Q.   And were you and Mr. Franklin sharing that?

13  A.   Yes.

14  Q.   So tell us about how that relationship transitioned from

15  being buyers of Mr. Townsend to you and Mr. Franklin becoming

16  salespeople yourself.

17  A.   Well, we were frustrated with him not being able to

18  deliver anything to us.  Roger had connections, like I said.

19  And --

20  Q.   Who were they?  Who were some of these connections?

21  A.   They were -- mostly in the beginning it was a family

22  member of his that lived in Marion.  I can't remember his

23  first name.  He was like a -- well, a grandson in some sorts.

24  I don't remember his name, though.  And we went to him and

25  started buying an eighth, an eight ball at a time through him.

LISA WENTWORTH - DIRECT

1  Q.  And is an eight ball a common term used for 3.5 grams?

2  A.  Yes.

3  Q.  And that's because it's one eighth of an ounce?

4  A.  Right.

5  Q.  All right.  How much were you buying the eight balls for?

6  A.  I think --

7  Q.  If you recall?

8  A.  It was between -- I think it was 280 to 300 dollars.

9  Q.  All right.  So in addition to that source of supply, did

10 you have others?

11 A.  We went from there to buying from another family member

12 of his up in Marion, his grandson.  His name was Mitch.  And

13 then there was another guy that we bought from named -- oh,

14 gosh, the name escapes me.  There was two people up in Marion

15 we bought drugs from after that.

16 Q.  And can you roughly tell us how much you and Mr. Franklin

17 bought in total from these connections in Marion.

18 A.  Well, we started out with an eight ball and probably

19 within three to -- three to five months we were probably

20 buying an ounce at a time.  And at the end it was -- we were

21 starting to buy 4 ounces at a time.

22 Q.  And an ounce, is that 28 grams?

23 A.  28 grams, yes.

24 Q.  How frequently were you -- when you were doing ounce

25 purchases from Marion, how frequently were you doing that?

LISA WENTWORTH - DIRECT

1    A.    About every other day.

2    Q.    Consistently?

3    A.    Yes.

4    Q.    And then about how long was that?

5    A.    We probably started in February or March with the ounce

6    and then we got arrested in August.  So in August we were

7    buying 4 ounces at a time.

8    Q.    When did you start buying 4 ounces at a time?

9    A.    Probably -- let's see.  Probably -- well, we progressed

10   to that.  It was an ounce and then 2 ounces and 3 ounces and

11   4 ounces.  So probably 4 ounces June, July.

12   Q.    So starting in June or July and then into August.  And

13   you mentioned your arrest.  That took place on August 19th?

14   A.    Yes.

15   Q.    And it was still every other day with that kind of

16   quantity?

17   A.    Sometimes every other day.  Sometimes every two days.

18   Q.    Okay.  Well, let's go to the date of your arrest.  Tell

19   us what happened.

20   A.    We were going to get more drugs.  We had left the house

21   and met with a friend of ours at Sage Brush.  And we were

22   looking for Bones because he owed us a substantial amount of

23   money.  And this guy --

24   Q.    So he was at that point -- he was now one of your

25   customers?

LISA WENTWORTH - DIRECT

1   A.   Yes.  Yes.

2       We met with a friend of ours at Sage Brush who told us

3   where Bones was at and we left Sage Brush to go find him.  I

4   made an illegal U-turn on 321 in Lenoir because I missed the

5   road I was supposed to turn on and went down a side road, and

6   the police got behind me they said because I made an illegal

7   U-turn.  And they saw that there was alcohol -- they smelled

8   alcohol coming from the car.  I got out of the car, did a

9   breathalyzer for them.  The car was illegal because I had

10  insurance on the car but the tag was not legal.  So they gave

11  me a ticket for that.

12      And then they asked to search the car.  And I asked them

13  why, and he didn't give me a reason.  He asked me why I wanted

14  him to search the car.  And I said, Well, I don't want you to

15  search the car because you might find a beer can.  You already

16  gave me a breathalyzer.  I don't need another ticket.

17      And they walked off and then they walked back to the car.

18  And I told them, I said, I didn't want you to search the car

19  because there's a gun in the car.  And he told me to put the

20  gun on the dash of the car, which I did.  And he had us step

21  out of the car.  He searched us and searched my pocketbook and

22  found stuff in my pocketbook and a quarter bag in my pocket.

23  Q.   And when you say "stuff," so a quarter bag and -- that's

24  a quarter of a gram?

25  A.   Quarter of a gram in my pocket.

LISA WENTWORTH - DIRECT

1    Q.    And did you also have a set of digital scales?

2    A.    I had digital scales in my pocketbook and I had a bowl in

3    my pocketbook.

4    Q.    What was the digital scales for?

5    A.    It was for weighing out the drugs.

6    Q.    For when you sell it?

7    A.    Yes.

8    Q.    Why do you have that with you when you and Mr. Franklin

9    are selling drugs?

10   A.    We were going to get more drugs and we always weighed

11   them before we got them.

12   Q.    And then when you were selling to your customers, did

13   they ever complain about the weight that they received?

14   A.    They never complained because I would usually weigh them

15   in front of them.  We would weigh it in front of them.

16   Q.    All right.  Now, with regard to the gun, what did you

17   tell the police about the gun?

18   A.    At that time I told them it was my gun that I had bought

19   for my son because I knew Roger was a convicted felon and it

20   would be five years on him.

21   Q.    Now, was that -- so I guess what you told the police on

22   August 19th, was that the truth?

23   A.    No.

24   Q.    After that date did you, in fact, about a week later and

25   then again the next year after you were charged federally, did

1    you, in fact, debrief with law enforcement?

2    A.    Did I debrief with them?

3    Q.    Yes.  Did you have interviews with law enforcement?

4    A.    Yes, I did.

5    Q.    All right.  With regard to -- with regard to the gun, how

6    often did Mr. -- how often during the conspiracy did

7    Mr. Franklin have a gun with him?  Was this the only time?

8    A.    He always carried a gun.

9    Q.    When you say always, what do you mean?

10   A.    Whenever we left the house, he always had a gun on him.

11   Q.    Where did he have the gun?

12   A.    Sometimes he'd put it under the seat.  Sometimes he'd put

13   it in the back of his pants.  Sometimes it would be in the

14   dash.  It just -- it varied.

15   Q.    After your arrest August the 19th -- August 19th of

16   2013 -- well, was that Mr. Franklin's only gun, the one that

17   was in the car?

18   A.    No.

19   Q.    Where were the other guns?

20   A.    We had five to six guns and they were in the building at

21   our house.

22   Q.    What -- do you know what, if anything, happened to them

23   after your arrest?

24   A.    When we got arrested, they were stole before I got back

25   out.  I got out in October of that year.  And between August

1   and October somebody -- well, I know who stole them.  The man

2   that was living in our house took them.

3   Q.   And by the way, you mentioned that you had been released.

4   At some point after you're released from jail, did you, in

5   fact, fail a drug test?

6   A.   I did, yes.

7   Q.   So you -- and were you using meth?

8   A.   Yes, I was.

9   Q.   Were you also -- did you also go back to selling meth?

10  A.   Not at that time I didn't.  I did after that.

11  Q.   What do you mean?

12  A.   I -- at that time I got out on house arrest in October

13  for two weeks and because I failed a drug test I came back to

14  jail.  But then I went -- when I got out the next time, about

15  a month after that I went back to selling drugs, yes.

16  Q.   When did you first use methamphetamine?

17  A.   Probably the beginning of 2013.

18  Q.   With whom?

19  A.   A friend of mine that I worked with.

20  Q.   So how did you and Mr. Franklin conduct your drug deals?

21  Can you just explain kind of the life cycle of a deal, if

22  there was an ordinary way that it happened.

23  A.   He always carried the money and I always carried the

24  drugs because we always decided if we got caught, we didn't

25  want to have one have both -- both of us have everything on us

LISA WENTWORTH - CROSS

1   so one could get the other one out of jail.  He did all the

2   sales and I was -- I did everything else.  I cut up the dope.

3   I weighed the dope.  I called the man when we needed to get

4   more.

5          MR. KAUFMAN:  Nothing further, Your Honor.

6          MR. THORSEN:  Thank you, Your Honor.

7                      CROSS EXAMINATION

8   BY MR. THORSEN:

9   Q.   Good afternoon, Ms. Wentworth.

10  A.   Hello.

11  Q.   Ms. Wentworth, you were saying that -- you talked about

12  at "our house" at some time.  Is that -- is that -- which

13  house is that you're talking about?

14  A.   We lived together in Kings Creek and we sold drugs there.

15  And then we left there and moved in with his father on

16  Trenton.

17  Q.   Okay.  And that was 2525 Old Trenton Place?

18  A.   Yes.

19  Q.   And you lived there with Roger Franklin.

20  A.   Yes.

21  Q.   Did Roger Franklin live in the house or did he live in an

22  outbuilding?

23  A.   He lived in the house.

24  Q.   Did he spend most of his time in the house?

25  A.   Yeah.  He had a pool table in there so he never left

1    much.

2    Q.    And the pool table was in the basement?

3    A.    Uh-huh.

4    Q.    And you sold drugs in the top floor?

5    A.    We sold drugs everywhere.

6    Q.    Back in 2012, 2013 Roger was working in Dallas; is that

7    correct?  Do you remember that?

8    A.    In 2013 -- yes, he was working.  He was a sheet metal

9    mechanic.

10   Q.    And he was working long hours down there, wasn't he?

11   A.    In 2012.  In 2013, no, he wasn't working.

12   Q.    Roger also worked on cars.

13   A.    Not really.  I mean...

14   Q.    Fixing up cars.

15   A.    He changes oil, I guess.  Not really.

16   Q.    When you were living with Roger, at some point there was

17   a domestic violence service call.

18   A.    Yes.

19   Q.    And did you get a no contact order?

20   A.    Yes, we did.

21   Q.    And where did you live after you got the no contact?

22   A.    I stayed at his dad's.  It was for the month of July.  He

23   stayed up in Laytown.

24   Q.    I'm sorry, you stayed at his dad's.  That's 25 --

25   A.    The house on Trenton.

1    Q.    2525 Old Trenton Place.

2          And where did Roger stay?

3    A.    He stayed in a camper at a friend's up in Laytown.

4    That's out in the country in Lenoir.

5    Q.    Now, didn't Roger stay away for something closer to eight

6    months?

7    A.    No, Roger was gone for one month.

8    Q.    You know Terri Clark.

9    A.    I do.

10   Q.    And she's a friend of yours.

11   A.    She's an acquaintance of mine.

12   Q.    She's someone you used meth with.

13   A.    Not really, no.

14   Q.    Not really.  So sometimes kind of used meth?

15   A.    No, I didn't use meth with her because she didn't use it

16   the way I use it.  Terri is an IV drug user and I wasn't.

17   Q.    So you might be smoking and she might be shooting up.

18   A.    Yes.  Terri was more of a customer of mine and Roger's.

19   Q.    William Townsend, is he somebody you used drugs with?

20   A.    Never.

21   Q.    Sheila Sipes?

22   A.    No.

23   Q.    You were saying on August 19th you were stopped by the

24   police.  August 19th you were stopped by the police because

25   you put a fictitious tag on your car.

1   A.   Yes, we had put the Honda tag on the Mustang because we

2   couldn't get the Mustang legal.

3   Q.   And then you were the one that was driving this car.

4   A.   That's correct.

5   Q.   And when the police stopped you, you had drugs on you.

6   A.   The drugs were on Roger.  I had drugs on me also.

7   Q.   You said there were drugs on Roger.

8   A.   Yes.

9   Q.   Where were the drugs on Roger?

10  A.   He had them in his pants.

11  Q.   Ms. Wentworth, after they stopped you, they brought you

12  out of the car; is that correct?

13  A.   Yes.

14  Q.   And they brought you back to the area back towards the

15  police car?

16  A.   They brought me to the back of the car.  I was standing

17  in front -- we both got out of the car and we were both

18  standing in front of a police car at the end of our car, at

19  the tail end of our car, yes.

20  Q.   Both you and Roger.

21  A.   Yes.

22  Q.   Okay.  Had both gotten out of the car.

23  A.   Uh-huh.

24  Q.   But you had gotten out first; is that correct?

25  A.   They took me out to do a breathalyzer and then I went and

1  got back in the car.  And then they came back and I told them

2  the gun was in the car and they had us both get out of the

3  car.

4  Q.   Do you recall Roger being searched at that point?

5  A.   They patted us both down.

6  Q.   And did you ever see Roger stumble?

7  A.   Probably.  Yeah, I'm sure I did.

8  Q.   That night did you see him stumble?

9  A.   When he walked across the road to go to the bathroom, he

10 stumbled.

11 Q.   Roger was drunk that night?

12 A.   Very drunk.  He was passed out in the seat when we were

13 pulled over.

14 Q.   Ms. Wentworth, you said that the gun was yours that

15 night.

16 A.   At that time I did, yes.

17 Q.   And the gun was between your seat, the driver seat, and

18 the center console.

19 A.   It was.

20 Q.   You were driving the car.  Roger was in the passenger

21 seat.

22 A.   Right.

23 Q.   You told the police that you bought the gun for your son

24 for his birthday.

25 A.   That's correct.

LISA WENTWORTH - CROSS

1   Q.   Ms. Wentworth, you entered a guilty plea in a meth
2   conspiracy.
3   A.   I did.
4   Q.   And you're testifying here in court before you've been
5   sentenced.
6   A.   That's correct.
7   Q.   Are you hoping to have a sentencing consideration for
8   your testimony?
9   A.   I don't know what that means.
10  Q.   Are you expecting to get a time cut, do less time because
11  you testified?
12  A.   I haven't been promised anything.
13  Q.   But are you expecting to get a time cut?
14  A.   I'm hoping that this will help me, yes.
15  Q.   After you were arrested August 19th, you did -- you were
16  in custody how many weeks?
17  A.   I was in custody from August 19th until sometime in
18  October.
19  Q.   And then you were out of custody and then you failed a
20  drug test.
21  A.   I was out of -- I was on house arrest for two weeks and I
22  failed a drug test and went back to jail.
23  Q.   How long were you in jail then?
24  A.   I was in jail until March the 10th when I got out.
25  Q.   And then you started dealing meth again.

LISA WENTWORTH - CROSS

1    A.    About a month after that, yes.

2    Q.    You went back and you lived at 2525 Old Trenton Place.

3    A.    I did when I got out on house arrest, yes.

4    Q.    And was Roger back there at this time?

5    A.    Roger was in jail.

6    Q.    And he was in jail for some time after that.

7    A.    He was in jail until November and he got out in two

8    weeks -- for two weeks and got busted again and came back.

9    Q.    And then he remained in jail.

10   A.    And he remained in jail, yes.

11   Q.    Now, at some point you sold a lot of his possessions.

12   A.    I sold a lot of our possessions, I did.

13   Q.    Were they your golf clubs that you sold?

14   A.    They were things we acquired while we were selling drugs

15   together.

16   Q.    Were they your golf clubs that you sold?

17   A.    I didn't sell his golf clubs.

18   Q.    You didn't sell his golf clubs.

19   A.    I'm sorry?

20   Q.    How about power tools?  You sold his power tools.

21   A.    We acquired the power tools, the mopeds, the things that

22   I sold, I sold while me and him were separated for that month.

23   That's when I sold those things, because I didn't have any

24   means to support me or his father because when he left he took

25   all the money.

1  Q.   Or to buy more drugs.

2  A.   Huh?

3  Q.   Or to buy more drugs.

4  A.   I sold it so we could even buy his dad cigarettes because

5  Roger took the money when he left.

6  Q.   Did you sell any of his cars?

7  A.   I've never sold any of his cars.  Roger has never had a

8  car in his name.

9  Q.   Let me go back to this August 19th when you're stopped

10  after you've made an illegal U-turn and you're driving a car

11  with the plates on it.  The officer asked you if he could

12  search your car.

13  A.   Yes.

14  Q.   And the officer asked you if there was anything illegal

15  in your car.

16  A.   I don't remember.  I don't think he did, but he might

17  have.

18  Q.   Do you recall telling him no?

19  A.   I probably did.  I don't remember.

20  Q.   Ms. Wentworth, you stayed in contact with Roger since --

21  in the last couple years; is that correct?

22  A.   I've been in contact with Roger my whole life.

23  Q.   And did you write to Roger at some point and tell him

24  you're going to put the gun on him now?

25  A.   I probably did.  I probably told him that I wasn't going

1   to take the charge again for him.

2   Q.   Did you write to him and tell him you were going to put

3   the gun on him because of a car -- a car you thought he stole

4   from you?

5   A.   I don't know if I did or not.  It's possible.  But I know

6   I told him I wasn't going to take the charge again for him.

7           MR. THORSEN:  No other questions.

8           MR. KAUFMAN:  Your Honor, just briefly.

9                   REDIRECT EXAMINATION

10  BY MR. KAUFMAN:

11  Q.   Ms. Wentworth, one area that the defense lawyer asked you

12  about was you expect or hope for a reduction in your sentence,

13  implying in return for your testimony today.  Who decides

14  whether to reduce your sentence and, if so, by how much?

15  A.   The judge decides.

16  Q.   Which judge?

17  A.   This judge sitting right here.

18  Q.   Judge Voorhees?

19  A.   Yes.

20  Q.   And what is the requirement for you to receive any

21  reduction in sentence?

22  A.   I don't know that there is any.

23  Q.   Are there any rules about your testimony?

24  A.   To tell the truth.

25  Q.   And what would happen if you were to testify in a way

1  that was not a hundred percent truthful?

2  A.   I wouldn't -- I'd probably get more time in jail.  I

3  wouldn't get any -- any from this.

4              MR. KAUFMAN:  Nothing further, Your Honor.

5              MR. THORSEN:  Nothing else.

6              THE COURT:  You may step down.

7              (Witness stepped down.)

8              THE COURT:  Members of the jury, we'll take our

9  lunch break at this time.  I'd ask you to keep an open mind

10  about the case.  Don't discuss it.  Remember the other

11  instructions I've given you.  You'll have an hour and a half

12  so please be back at quarter of 2:00, 1:45.  Thank you.

13              (Jury exited the courtroom.)

14              THE COURT:  Okay.  Anything for the Court before we

15  recess?

16              MR. KAUFMAN:  Your Honor, two things.

17              One, in terms of scheduling we have two more inmate

18  witnesses who I anticipate will be much shorter than

19  Ms. Wentworth's testimony, so therefore quite brief.  There's

20  a possible third witness who is in the community who we're

21  trying to locate, so it might just be those two short

22  witnesses.  So it looks like we'll be able to proceed with the

23  next phase relatively quickly after lunch.

24              There is one issue, though, with regard to the

25  instructions, and I'll call up what I've used before under

1    similar circumstances.  The defense with both Officer Crisp as
2    well as with Ms. Wentworth were asking about consent and
3    whether the search was done properly.  And obviously, this is
4    not a case where there's been a motion to suppress or
5    anything, but they're raising the specter as if there was some
6    sort of search concern.  And we'll be asking for an
7    instruction that the evidence that's been admitted from that
8    seizure is lawfully considered by them during their
9    deliberations.
10          THE COURT:  All right.  You may propose some
11   language if you see fit.
12          MR. KAUFMAN:  Thank you, Your Honor.
13          THE COURT:  And we'll consider it.
14          MR. KAUFMAN:  Yes, Your Honor.
15          THE COURT:  Thank you all.
16          (Lunch recess at 12:18 p.m.)
17   TUESDAY AFTERNOON, JULY 7, 2015
18          (Court back in session at 2:05 p.m.)
19          THE COURT:  Okay.  Are the parties ready to begin?
20          MR. KAUFMAN:  Yes, Your Honor.
21          MR. THORSEN:  Yes, Your Honor.
22          THE COURT:  May we have the jury, please.
23          (Jury entered the courtroom.)
24          THE COURT:  Okay.  I trust the members of the jury
25   had a satisfactory lunch.  Thank you for being prompt with us.

1   We did have an item of business to take care of before you

2   returned to the courtroom.

3           You may call your next witness.

4           MR. KAUFMAN:  Thank you, Your Honor.

5           The United States calls Sheila Hamby Sipes.

6           SHEILA HAMBY SIPES, GOVERNMENT WITNESS, SWORN,

7                   DIRECT EXAMINATION

8   BY MR. KAUFMAN:

9   Q.   Good afternoon.

10  A.   Good afternoon.

11  Q.   Ma'am, if you would, please state your full name and

12  spell your last name for the record.

13  A.   Sheila Hamby Sipes, S-i-p-e-s.

14  Q.   Ma'am, do you know the man to my left, Roger Dale

15  Franklin?

16  A.   Yes.

17  Q.   How do you know him?

18  A.   Through a mutual acquaintance, Rocky Price Wood.

19  Q.   When did you meet Mr. Franklin?

20  A.   Earlier last year.

21  Q.   And when you say last year, do you mean 2014 or 2013?

22  A.   2014, I believe.

23  Q.   Do you remember being with Mr. Franklin and being stopped

24  by law enforcement?

25  A.   I do.

1  Q.  When was that?

2  A.  It was 2014, I believe.

3  Q.  When you say you believe, do you remember what month and

4  day it was?

5  A.  I do remember the month and day.  It was November the

6  20th.

7  Q.  Okay.  So are you saying that it was just about nine

8  months ago?

9  A.  No, it's a little over that.  So it would have been 2013,

10  then.

11  Q.  Okay.

12  A.  I'm sorry.

13  Q.  No, no, that's okay.

14      Let me ask you, at that point when you were stopped by

15  law enforcement with him, at that point in time, how long had

16  you known Mr. Franklin?

17  A.  Probably about two to four months or so.

18  Q.  Now, when you were stopped, can you tell us just very

19  briefly what happened.  Like, what led to -- what happened

20  with you and Mr. Franklin before the stop and then at the

21  stop?

22  A.  I was at a residence where he was at the night before and

23  we took off from there and we went up the mountain to point A

24  where at first he went to try to get some.  It did not happen.

25  Q.  I'm sorry, ma'am, just to interrupt for a moment if I

1  may.  You said "to get some."  What are you referring to?

2  Some what?

3  A.   Some drugs.

4  Q.   All right.  What kind of drugs?

5  A.   Meth.

6  Q.   And were you aware that that's what he was trying to get

7  while he was trying to get it?

8  A.   I did.

9  Q.   Okay.  Had you used drugs with Mr. Franklin before?

10  A.   I have.

11  Q.   All right.  About how many times?

12  A.   About two or three times.

13  Q.   Okay.  I'm sorry for interrupting.  So after he was

14  trying to get some, then what happened?

15  A.   At point A where he tried to get something, it didn't

16  happen.

17      Point B where he tried to get some, they come in, he got

18  it and we went down the road.

19      Okay.  Down the road he pulled over at a store.  Hey,

20  just in case we get pulled over, you know, he put that up on

21  me.  And then we got pulled over shortly there afterwards.

22  Q.   You said that he -- I hope I don't mess up the way you

23  were wording it, but something to the effect that he put that

24  up to you.  What are you talking about?

25  A.   He said -- you know, he handed me the package, right, of

1  the meth and he said just in case we get pulled over, you

2  know, it would be on me at the time.  So that's what happened.

3  Q.  And did you agree to take it?

4  A.  I did.

5  Q.  Why?

6  A.  Well, I really wasn't thinking at the time and, you know,

7  just stupid mistake.

8  Q.  Where did you put the methamphetamine?

9  A.  I had it secured right here in my britches.

10        MR. KAUFMAN:  Okay.  Thank you.

11        Nothing further, Your Honor.

12        MR. THORSEN:  Thank you, Your Honor.

13              CROSS EXAMINATION

14  BY MR. THORSEN:

15  Q.  Ms. Sipes, you've used methamphetamine.

16  A.  I have.

17  Q.  How many times have you used it?

18  A.  About, I guess, three or four times or so.

19  Q.  Three or four times?

20  A.  Yeah.

21  Q.  And you used it three or four times with Roger Franklin

22  before November 20th.

23  A.  You mean total use, I'm sorry?

24  Q.  Total use, yes.

25  A.  Total use.  Total use in all, I guess, you know, not

1  including with him, probably about ten times, I guess.

2  Q.    Ten times?

3  A.    Yeah.

4  Q.    How do you use meth?  Do you smoke it?

5  A.    I smoke it.

6  Q.    And how else have you used meth?

7  A.    I've snorted it.

8  Q.    How else have you used it?

9  A.    I have shot it.

10 Q.    Okay.  And when was the last time you used meth?

11 A.    About two to three months ago.

12 Q.    At that time did you shoot it or snort it or smoke it?

13 A.    I snorted it.

14 Q.    What drugs are you on right now?

15 A.    I ain't on no drugs right now.

16 Q.    Motorix?  What are you --

17 A.    I'm sorry, I'm on none.

18 Q.    Oh, none.

19 A.    None.

20 Q.    Really?  Okay.

21        Ms. Sipes, you're saying that Roger told you to put the

22 meth in your pants or in your bra or...

23 A.    He didn't tell me where to.

24 Q.    Ms. Sipes, have you been told that if you testify here

25 today, you're not going to be prosecuted?

TERRI CLARK - DIRECT

1  A.   Yes.

2         MR. THORSEN:  Thank you.  No other questions.

3         THE WITNESS:  Thank you.

4         MR. KAUFMAN:  Just briefly, Your Honor.

5                    REDIRECT EXAMINATION

6  BY MR. KAUFMAN:

7  Q.   Ms. Sipes, are there any conditions on your testimony and

8  the possibility you will not be prosecuted?

9  A.   Yes.  Say the whole truth, nothing but the truth, and

10 stay out of trouble.

11        MR. KAUFMAN:  Nothing further, Your Honor.  Thank

12 you.

13        MR. THORSEN:  No recross.

14        THE COURT:  You may step down.

15        THE WITNESS:  Thank you.

16        (Witness stepped down.)

17        MR. KAUFMAN:  Your Honor, the United States calls

18 Terri Clark.

19        TERRI ELAINE CLARK, GOVERNMENT WITNESS, SWORN,

20                    DIRECT EXAMINATION

21 BY MR. KAUFMAN:

22 Q.   Good afternoon.

23 A.   Good afternoon.

24 Q.   If you would, please tell the jury your full name and

25 spell it for the record.

TERRI CLARK - DIRECT

1  A.   My name is Terri Elaine Clark.  T-e-r-r-i, E-l-a-i-n-e,
2  C-l-a-r-k.
3  Q.   And are you here having pled guilty to a methamphetamine
4  conspiracy?
5  A.   Yes, I am.
6  Q.   And how much did you plead to in your conspiracy?
7  A.   Mine is to distribute 500 to 1,500 grams.
8  Q.   Of methamphetamine?
9  A.   Yes.
10  Q.   Do you see any of your co-conspirators in the courtroom
11  today?
12  A.   Yes, I do.
13  Q.   Who do you see?
14  A.   Roger Franklin.
15  Q.   Can you tell us where he's sitting and what he's wearing.
16  A.   He is sitting over there.  He's wearing the suit, beard.
17        MR. KAUFMAN:  Your Honor, may the record reflect a
18  correct in-court identification of the defendant.
19        THE COURT:  It will so reflect.
20        MR. KAUFMAN:  Thank you, Your Honor.
21  Q.   How did you meet Mr. Franklin?
22  A.   I met Roger through some friends.
23  Q.   When did that happen?
24  A.   It was March 2013.
25  Q.   And how soon did it turn into a drug trafficking

1  relationship?

2  A.    Pretty quick actually.  Within a few weeks.

3  Q.    Can you kind of describe how it all started.

4  A.    I started by buying pills.  I was an opiate user and my

5  boyfriend at the time was on house arrest and couldn't work

6  and I couldn't find a job and I needed a way to make some

7  money.  So within a few weeks I was selling a little bit here

8  and there and --

9  Q.    And were you selling pills or methamphetamine?

10  A.    Methamphetamine.

11  Q.    And where were you getting the methamphetamine from?

12  A.    From Roger.

13  Q.    Who was -- can you tell us about the conversation, how

14  that all started.

15  A.    Just basically I told him that I needed to make some

16  money.  Me and Parks had just got a house and I needed to make

17  sure that we kept our place to live.  And he told me that he

18  had a way for me to make some money.

19  Q.    What did he tell you?

20  A.    He asked me if I'd ever -- if I know anybody that done

21  meth.

22  Q.    In the beginning how much were you getting from him?

23  A.    In the beginning it was just -- for the first few weeks,

24  if somebody came to me and needed something, I'd get their

25  money, I'd go to Roger and I would pick up what they needed.

1  He would give me a good price on it so I could make something

2  off of it.  And in no time at all more people were coming once

3  they found out that I could get stuff.  And it just snowballed

4  over six, seven months.

5  Q.   And was there kind of a usual amount that you were

6  getting from him or did it vary?

7  A.   At first it varied, usually about a quarter bag to a half

8  a gram.  And before long I was getting about two eight balls

9  at a time.  And then I was going and re-upping and getting two

10 eight balls every -- two, three times a day.

11 Q.   And that kind of frequency and amount, how long did that

12 last?

13 A.   Started in March.  It probably took a month and a half to

14 two months to get up to that.  And that lasted until Labor

15 Day.

16 Q.   And is it your testimony that the 500 to 1,500 grams that

17 you pled to, that that methamphetamine came from the

18 defendant, Mr. Franklin?

19 A.   Yes.

20 Q.   What's the most that you had received from Mr. Franklin

21 at any one time?

22 A.   The most I got from him at any time was two eight balls.

23 Q.   And when you say "two eight balls," you're talking about

24 7 grams?

25 A.   Yes.

1  Q.   Do you recall from speaking to Mr. Franklin or anybody

2  else involved in the conspiracy an occasion when Mr. Franklin

3  and Ms. Wentworth were stopped by law enforcement?

4  A.   Yes.

5  Q.   And how did you learn about that stop?

6  A.   The night that it happened they had just left my house.

7  They were supposed to come back.  My boyfriend at the time

8  was -- he had been up for days on methamphetamine and was

9  hallucinating real badly.  Thought people were trying to hurt

10 him.  And they said they had some business to take care of,

11 that they would come back after they were done and they would

12 take us to Frye Hospital in Hickory so I could get him some

13 help.  They left and when an hour or two went by and I didn't

14 hear from them and they wasn't answering their phones, I

15 started calling around.  And I don't remember exactly who, but

16 somebody told me they had been picked up.

17 Q.   After they got picked up, did you ever deal with

18 methamphetamine with either of them again?

19 A.   Yes, I did.

20 Q.   Can you tell us about that.

21 A.   They were both in jail.  Roger bonded out.  Lisa was

22 still in.  And I started buying from them again immediately

23 when he got out.  He wasn't out another two weeks or so before

24 he got picked up on Labor Day.  After that, he came out again,

25 but I didn't buy anything else from him after Labor Day.  I

1   was done.

2           MR. KAUFMAN:  Nothing further.  Thank you.

3                   CROSS EXAMINATION

4   BY MR. THORSEN:

5   Q.   Ms. Clark, when you say you were done then, you meant you

6   got no more meth from Roger?

7   A.   Excuse me, I didn't hear you.

8   Q.   You said you were done.

9   A.   Uh-huh.

10  Q.   And so you stopped getting meth all together.

11  A.   After Labor Day I quit dealing with meth for quite a

12  while.  After that I had -- I had started using while I was

13  dealing and I would still buy some here and there for personal

14  use.  And then it was a pretty good while -- it was probably

15  another eight months to a year before I started -- I started

16  selling a little bit here and there again just to supply my

17  own use.

18  Q.   And were you getting it again from Lisa Wentworth then?

19  A.   I was getting it from Lisa and a few -- I mean, numerous

20  other sources.

21  Q.   So Lisa Wentworth was a source for you for a long time.

22  A.   On and off.  She did some prison time.  She was in jail

23  quite a bit, so over that period she wasn't really out that

24  much.

25  Q.   Now, you're friends with Lisa Wentworth?

1  A.    Acquaintances.

2  Q.    Okay.  Have the two of you done drugs together?

3  A.    No.  When I was using, I was -- I used a needle.  I was

4  an intravenous user.  We did our -- she didn't do pain pills.

5  And methamphetamine she smoked and I wouldn't smoke.  So, you

6  know, at one point we were all around each other high I'm

7  sure, but we never did drugs together, no.

8  Q.    But Lisa -- Lisa is someone you spent time with.

9  A.    Yes, but most of the time it was on a business level.

10 Q.    When Roger was locked up and Lisa Wentworth was not

11 locked up, do you recall a time when Lisa Wentworth started to

12 sell all of Roger's things and Roger's father's things?

13 A.    Not his father's.  They were living together in the house

14 for quite a while and the things that she was selling was

15 mutual between both of them.

16 Q.    Okay.  So she was selling a lot of stuff.

17 A.    Not a lot.  Once again, it was business.  I was in and

18 out and didn't really see everything going on.  Things --

19 things would go missing, but I didn't know what happened to

20 them and it wasn't really my place to ask.

21 Q.    Did you write to Roger while he was in custody?

22 A.    Yes.

23 Q.    Do you recall writing to him and saying you can't believe

24 how Lisa is selling all of his stuff?

25 A.    No.

1   Q.   You don't recall that?

2   A.   I do not.

3   Q.   And you're testifying -- you're hoping to get a time cut

4   through your testimony?

5   A.   No, it is a condition in my plea to cooperate and testify

6   if they need me.  But he was very persistent that I should

7   just tell the truth.  When it comes down to it, you know, my

8   plea is open.  It's 0 to 20 years and the person making the

9   final decision in my case will be Judge Voorhees.  The

10  prosecution has not offered me any kind of deals or bargains

11  or anything.

12  Q.   They haven't told you they'll make a downward departure

13  motion for a smaller sentence if you --

14  A.   There was a place when I did my PSI that talked about a

15  downward departure.  It said that I did not qualify.  So I'm

16  really not even sure what all that consists of.

17  Q.   Okay.  Because at that point you hadn't testified when

18  your PSI --

19  A.   I did not know until three or four weeks ago that I was

20  even being called to testify.

21  Q.   And you were prepped to testify today.

22  A.   Uh-huh.

23  Q.   Okay.  And you met with Mr. Kaufman over here.

24  A.   Yes, I did.

25  Q.   Okay.  And did he tell you that if you didn't testify,

1  you were going to lose the benefit of your plea?

2  A.   He just pointed out that in my plea bargain that is a

3  condition that I cooperate; and that if I don't cooperate,

4  that will take my plea bargain off the table.  But he did not

5  offer me any kind of deals or bargains.  He told me it would

6  be up to Judge Voorhees; that, you know, he could not

7  guarantee anything either way.

8  Q.   And did Mr. Kaufman tell you make sure the jury

9  understands you haven't been offered any deals?

10  A.   He told me just to be honest.  He said the two rules to

11  testifying, be honest and, number two, be honest.

12  Q.   Now, your drug use hasn't been limited to

13  methamphetamine.

14  A.   No.

15  Q.   You drunk a lot of alcohol?

16  A.   No, I've never been a drinker.

17  Q.   You've used opiates.

18  A.   Yes, I was an opiate user.

19  Q.   You were smoking them.

20  A.   Excuse me?

21  Q.   How were you using the opiates?

22  A.   I used it with a needle.   Intravenous.

23  Q.   And you've used methamphetamine for how long?

24  A.   I started in March of 2013 and I have not done anything

25  since I was picked up October 1st.  And I'd been in the

WILLIAM TOWNSEND - DIRECT

1  hospital for eight days prior to that so I hadn't done
2  anything.
3  Q.   And you've been convicted of -- oh, I'm sorry.
4         MR. THORSEN:  Thank you.  No other questions.
5         MR. KAUFMAN:  Nothing further, Your Honor.
6         THE COURT:  You may step down.
7         THE WITNESS:  Thank you.
8         (Witness stepped down.)
9         MR. KAUFMAN:  Your Honor, the United States' final
10  witness is William Clyde Townsend.
11        THE COURT:  There may be a short delay here, members
12  of the jury.  If so, you may be at ease.  That means you may
13  stand and stretch and speak to one another, but not about the
14  case.
15        (Pause.)
16    WILLIAM CLYDE TOWNSEND, GOVERNMENT WITNESS, SWORN,
17                   DIRECT EXAMINATION
18  BY MR. KAUFMAN:
19  Q.   Good afternoon.
20  A.   Good afternoon.
21  Q.   Sir, if you would please state your full name for the
22  record.
23  A.   William Clyde Townsend.
24  Q.   Sir, are you here having pled guilty to a methamphetamine
25  trafficking conspiracy?

1   A.   Yes, sir.

2   Q.   And how much was involved in your conspiracy?

3   A.   5,000 to 15,000 grams.

4   Q.   Do you see any of your co-conspirators in the courtroom

5   today?

6   A.   Yes, sir.

7   Q.   Who do you see?

8   A.   Do what now?

9   Q.   I had asked if you had seen any of your co-conspirators

10  in the courtroom today.

11  A.   No, sir.

12  Q.   Are you familiar with a person by the name of Roger Dale

13  Franklin?

14  A.   Yes, sir.

15  Q.   How do you know him?

16  A.   I bought dope off of him.

17  Q.   Okay.  Do you see him in the courtroom today?

18  A.   I guess that's him over there.

19  Q.   Okay.  Well, I'm not answering questions today, sir.

20  It's for you to answer.

21       How is your vision?

22  A.   It ain't too good.

23  Q.   Okay.

24  A.   I mean, I -- he's changed.  I don't see him, I mean...

25  Q.   But you are familiar with the name as a person?

1  A.    Yeah, Roger Dale Franklin.

2  Q.    Can you tell me when you first met Mr. Franklin?

3  A.    I met him a few years back, but I met him -- I started

4  dealing with him beginning of 2012.

5  Q.    And who was the buyer and who was the seller at that

6  point?

7  A.    I was the buyer.  He was the seller.

8  Q.    Okay.  In the very beginning is that the case?

9  A.    Yeah.

10  Q.    All right.  And the trafficking relationship that you had

11  with him, did it ever switch back and forth?

12  A.    Yes, sir.

13  Q.    Can you describe that.

14  A.    I've sold him probably maybe an ounce in eight balls.

15  Like a half ounce at a time.  Maybe an eight ball at one time.

16  But no more than an ounce.  And then I started buying off of

17  Roger Dale Franklin.

18  Q.    And, sir, by the way, do you have a prior conviction for

19  selling methamphetamine?

20  A.    Yes, sir.

21  Q.    Is that the one in 2010?

22  A.    Yes, sir.

23  Q.    And was that based on your sales in July of 2008 of

24  1.6 grams, 0.7 grams, and 1.8 grams?

25  A.    Yes, sir.

1    Q.    When you were buying from Mr. Franklin, how much were you

2    buying?

3    A.    A half ounce to an ounce every week.

4    Q.    And then what were you doing with that methamphetamine?

5    A.    I was keeping up my habit plus selling.

6    Q.    At those quantities, about how long did that last?

7    A.    From the beginning of 2012 to the summer of 2013.

8    Q.    Did you ever see Mr. Franklin with any kind of weapons?

9    A.    Yes, sir.

10   Q.    Can you tell us what kind of weapons and when you saw him

11   with them.

12   A.    It was a handgun, automatic handgun.  And I seen him with

13   it every time I'd meet him to make a buy.

14   Q.    Where -- where did he have the weapon?

15   A.    If he got out of the vehicle, he'd have it stuffed down

16   behind him.  Or if he was in the truck, he would have it

17   laying in the seat.

18   Q.    I would like to show you what's been admitted already on

19   the screen.  It's Exhibit 13A.  I know you said that your

20   vision isn't great, but are you able to see what's on the

21   screen right now?

22   A.    Yes, sir.

23   Q.    Do you recognize the person in that photograph?

24   A.    That's Roger Franklin.

25   Q.    The same person you've been testifying about?

1   A.    Yeah.

2            MR. KAUFMAN:  All right.  Thank you.  Nothing

3   further.

4                    CROSS EXAMINATION

5   BY MR. THORSEN:

6   Q.    Mr. Townsend, you have a prior conviction for selling

7   meth?

8   A.    Yes, sir.

9   Q.    And you know Terri Clark?

10  A.    Terri Clark?

11  Q.    Yes.

12  A.    No, sir.

13  Q.    Do you know Lisa Wentworth?

14  A.    Lisa Wentworth?

15  Q.    Yes.

16  A.    Yes.

17  Q.    How do you know Lisa Wentworth?

18  A.    She's Roger's girlfriend.

19  Q.    Did she become your girlfriend at any time?

20  A.    No, sir.

21  Q.    Did you keep on seeing Lisa after Roger got locked up?

22  A.    No, sir.

23  Q.    Did you buy any of Roger's tools when Lisa sold them when

24  he was locked up?

25  A.    No, sir.

1          MR. THORSEN:  No other questions.

2          MR. KAUFMAN:  Nothing further, Your Honor.

3          THE COURT:  Okay.  You may step down.

4          (Witness stepped down.)

5          MR. KAUFMAN:  Your Honor, the United States rests.

6          THE COURT:  All right.  Thank you.

7          Members of the jury, if you'll step into the jury

8   room, we'll call for you in a few minutes.

9          (Jury exited the courtroom.)

10         THE COURT:  Okay.  Do we have a motion?

11         MR. THORSEN:  Yes, Your Honor.  I'd be making a

12  motion to dismiss, Your Honor, at the conclusion of the

13  state's evidence, just looking back over the different counts,

14  and move to dismiss all counts, Your Honor.  I don't wish to

15  be make any further argument.

16         THE COURT:  All right, sir.  The Court is required

17  to take the light -- the evidence in the light most favorable

18  to the government at this stage and the motion will therefore

19  be denied, there being sufficient evidence for that purpose.

20         Now, then, I'll speak to you, sir, and I'll have a

21  question or two for you.

22         Mr. Franklin, do you understand that you have an

23  absolute right to take the stand and offer your own testimony

24  in your own defense?

25         THE DEFENDANT:  Yes.

1          THE COURT:  Do you also understand that you have an

2    absolute right not to testify in your own defense and in that

3    event the jury would be instructed that it cannot hold against

4    you the fact that you decided not to testify?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you understand that?

7          THE DEFENDANT:  Yes.

8          THE COURT:  So you have the option and it's your

9    option to testify or not.  Your attorney can advise you based

10   on his experience as to the pros and cons or advantages and

11   disadvantages of testifying or not.  Do you understand that

12   you should consult with your attorney on this question?

13         THE DEFENDANT:  Yes.

14         THE COURT:  And have you done that?

15         THE DEFENDANT:  I need to now.

16         THE COURT:  All right.  Well, we'll give you time to

17   do that.  I do want to ask you also, do you understand that

18   whatever advice your attorney may give you or has given you,

19   ultimately it is your decision whether to testify and not your

20   attorney's decision?

21         THE DEFENDANT:  Yes.

22         THE COURT:  All right, sir.  We'll take a 15 minute

23   recess.

24         (Brief recess at 2:42 p.m.)

25         (Court back in session at 3:24 p.m.)

 1          THE COURT:  Okay.  Has the defendant decided about
 2  offering any evidence?
 3          MR. THORSEN:  Yes, Your Honor.  I believe we're not
 4  going to offer any evidence.
 5          THE COURT:  All right.  Is that your decision, sir,
 6  as far as your own right to testify, that you have declined to
 7  testify?
 8          THE DEFENDANT:  Yes, sir.
 9          THE COURT:  All right, sir.  Then I take it you did
10  talk to your attorney about it.
11          THE DEFENDANT:  Yes.
12          THE COURT:  Okay.  Very well.  And there's no other
13  evidence from the defendant; is that right?
14          MR. THORSEN:  Correct, Your Honor.
15          THE COURT:  Very well.  All the evidence, then, now
16  being heard, would you have a final motion?
17          MR. THORSEN:  I'd renew my motion to dismiss, Your
18  Honor.
19          THE COURT:  All right, sir.  That will be denied.
20  So we will move along.
21          How long do the parties wish to have to argue their
22  cases?
23          MR. THORSEN:  Fifteen minutes.
24          MR. KAUFMAN:  Twenty minutes.  We probably will not
25  be using the full 20 minutes, but if we could each have 20.

1    And I'll divide mine up doing most of it in my opening and

2    then a little bit for rebuttal.

3          THE COURT:  All right.  It will be 20 minutes and

4    both sides -- you would have that for both your opening and

5    closing.

6          MR. KAUFMAN:  Thank you, Your Honor.

7          THE COURT:  And if you reach the -- either of you

8    reaches the five minutes left point, the clerk will so advise

9    you.

10          MR. THORSEN:  Thank you.

11          THE COURT:  Now, what I would propose to do is bring

12    the jury back and give them the first part of the

13    instructions.  That is, the -- what you might call the

14    boilerplate, the instructions before we reach the substantive

15    instructions such as for conspiracy.  Then let you argue your

16    cases today if you're ready to do that.  Are you ready?

17          MR. KAUFMAN:  Yes, Your Honor.

18          MR. THORSEN:  I can be, Your Honor.  Or we can argue

19    tomorrow if that's -- I can be ready.

20          THE COURT:  Well, I think it -- I mean, my

21    preference would be to use the jury's time, but if you have a

22    strong preference otherwise, we'd hear you.

23          MR. THORSEN:  I'm ready, Your Honor.

24          THE COURT:  All right.  So we'll do that, and then

25    we'll see what time it is.  I may have to give the balance of

1   the instructions tomorrow before the jury begins to

2   deliberate.

3           MR. THORSEN:  Okay.

4           THE COURT:  But in any event, they won't be

5   deliberating today.

6           All right.  Thank you very much.

7           May we have the jury.

8           (Jury entered the courtroom.)

9           THE COURT:  Members of the jury, just for your

10  information, the gentleman to my right is Julian Durant who is

11  a licensed lawyer who is serving as a law clerk to the Court.

12  There are also four people sitting in the front row there.

13  They are interns who are law students who are observing the

14  proceedings and who are working with the Court this summer.

15          Now, then, the parties will recognize that we have

16  heard the evidence of the government.  I'll now ask the

17  defendant if there will be evidence for the defendant?

18          MR. THORSEN:  No, Your Honor.  We rest.

19          THE COURT:  All right, sir.

20          MR. THORSEN:  No evidence.

21          THE COURT:  Both sides have now rested their cases

22  so you have heard all the evidence and I will proceed as

23  follows.  I'll give you the initial part of the jury

24  instructions, something like the first half.  Then the parties

25  will argue their cases to you.  And then we'll probably lay

over until tomorrow because of the hour.  And then you'll have the case -- you'll have the latter part of the jury instructions and the case to be decided and jury deliberations tomorrow.

So the first part of the instructions, then, are as follows:

You have heard all the evidence and you will shortly be hearing the arguments of counsel.  So now I will instruct you as to this first part of the law that applies in this case.  I will instruct you on some rules for jury consideration of cases of this type, including how to assess the credibility of witnesses.  Then I'll discuss the offenses charged in this case and give you the elements or particular facts of each charge that have to be proved.  And then I'll follow with direction to guide you in your deliberations.

It's your duty and your responsibility in the trial to find the facts.  You may find those facts only from the evidence which has been presented during this trial.  The evidence consists only of the testimony of the various witnesses who have been called and sworn and testified in your presence, the exhibits which were admitted into evidence by the Court, and the stipulations of fact made by the parties.

I instruct you that all of the evidence that you have heard was determined to be admissible by the Court and therefore is for you -- before you and for your consideration.

1    In reaching your decision as to the facts, it's your
2    sworn duty to follow the law as the Court instructs you.  You
3    will apply the law given to you by the Court to the facts
4    which you find from the evidence and reach your verdict
5    accordingly.
6        The lawyers may properly refer to some of the
7    governing rules of law in their arguments to you in a few
8    moments.  If, however, any difference appears to you between
9    the law as stated by the Court and stated by counsel, of
10   course, you are to be guided by these instructions.
11       You're not to single out any one instruction alone
12   as stating the law but must consider all of the instructions
13   as a whole.  And you may not follow or substitute any personal
14   or private notion or opinion as to what the law is or ought to
15   be.
16       You are required to perform these duties without
17   bias, prejudice or sympathy for or against any party.  The law
18   does not permit jurors to decide cases on the basis of bias,
19   prejudice, sympathy or any perceived public opinion or on any
20   basis other than solely upon the basis of the facts and the
21   law that arise in this particular case.
22       This case involves nine charges brought against the
23   defendant, Roger Dale Franklin, in the bill of indictment
24   which is titled First Superseding Bill of Indictment.
25       The first one is conspiracy to possess with intent

1  to distribute a mixture and substance containing a detectable
2  amount of methamphetamine in violation of 21, U.S. Code,
3  Sections 846 and 841(a)(1).

4        Two, three counts of possession with intent to
5  distribute a mixture and substance containing a detectable
6  amount of methamphetamine.

7        Three, one count of possession with intent to
8  distribute a mixture and substance containing a detectable
9  amount of methamphetamine, or aiding and abetting that
10 offense.

11       Also, two counts of possession of a firearm in
12 furtherance of a drug trafficking crime, or aiding and
13 abetting that offense.

14       And two counts of possession of a firearm after
15 previously having been convicted of a crime punishable by
16 imprisonment for a term exceeding one year.

17       You are instructed that an indictment is but a
18 formal method of accusing a defendant of a crime.  It is used
19 to inform the defendant of the charges against him and bring
20 him to trial.  It is not evidence of any kind against the
21 defendant nor does it permit any presumption or inference of
22 guilt.  In other words, an indictment is not consistent either
23 with guilt or lack of it.  It simply puts that question at
24 issue for your decision.

25       At arraignment the defendant entered a plea of not

guilty to these charges and thereby made a general denial of all the accusations contained in the bill of indictment. So it's up to you, the jury, to decide if, in fact, the defendant is guilty or not guilty of the charges and each of them as outlined in the bill of indictment.

Now, a separate crime or offense is charged in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you may find an accused guilty or not guilty as to one of the offenses charged should not control your verdict as to any other offense.

Now, every defendant in a criminal case, and, of course, the defendant here, is presumed to be innocent of a crime. And this presumption continues throughout the course of the trial. This presumption will end as to any given count only if you reach the jury room and arrive unanimously at the conclusion, if you do, that the government has shown to your satisfaction that defendant is guilty beyond a reasonable doubt as to that count of the indictment. This burden on the government does not change at any time during the course of the trial.

The presumption of innocence in favor of defendant is not a mere formality to be disregarded by the jury at its pleasure. Rather, it is a substantive part of our criminal law. Accordingly, the government must prove each of the

1   elements of the crime charged beyond a reasonable doubt before

2   there can be a conviction on the count under your

3   consideration.

4          Since at the outset the law presumes the defendant

5   to be innocent, he begins the trial with a clean slate.

6   Presumption of innocence is therefore sufficient to acquit him

7   as to any given count unless overcome by evidence of guilt

8   proven beyond a reasonable doubt.  The law permits only the

9   evidence actually presented to the jury to be considered in

10  support of any of the charges and all of them against him.

11         If the evidence is sufficient to overcome the

12  presumption of innocence and to convince you beyond a

13  reasonable doubt of the guilt of the defendant as to the

14  charge, then it would become your duty to find him guilty of

15  that charge.  But if you have a reasonable doubt as to his

16  guilt on a given charge, then it would be your duty to give

17  him the benefit of that doubt and acquit him accordingly.

18         Now, the government has the burden of proving to you

19  its contentions and each element of the offenses charged

20  beyond a reasonable doubt.

21         Now, the term "reasonable doubt" means just what it

22  says.  It's a doubt based upon reason and common sense.  Its

23  meaning is no doubt self-evident and understood by you and the

24  Court will not attempt to define it any further.

25         It is sometimes said that there are two types of

1   evidence which a jury may properly assess in determining
2   whether the government has met its burden of proof as to any
3   offense.  One would be direct evidence such as testimony of an
4   eye witness.  The other is circumstantial evidence:  The proof
5   of a chain of circumstances pointing to the commission of the
6   offense.  Circumstantial evidence is evidence of facts or
7   circumstances from which the existence or nonexistence of
8   other facts in controversy may be inferred.

9           As a general rule, the law makes no distinction
10  between direct and circumstantial evidence but simply requires
11  before convicting a defendant, the jury must be satisfied of
12  his guilt beyond a reasonable doubt from all the evidence in
13  the case.

14          Circumstantial evidence, of course, may in some
15  cases point to a wholly incorrect result.  Yet, this is
16  equally true of testimonial evidence.  In both types of
17  evidence you are asked to weigh the chances that the evidence
18  correctly points to the establishment of the facts against the
19  possibility of inaccuracy or ambiguous inferences.  In both
20  types of evidence you must use your experience with people and
21  events in weighing the evidence.

22          Now, while you should only consider evidence
23  presented during the trial, you are permitted to draw such
24  reasonable inferences from the testimony and exhibits as you
25  feel are justified in the light of common experience.  In

other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in the case.

Now, where there's a question as to what took place, you must determine the credibility of the witnesses. The Court instructs you that you are the sole judges of the credibility of the witnesses and the weight that their testimony deserves. While there is no absolute or arbitrary guide or measure by which you determine truthfulness, or the lack of it, in a witness, I will point out to you certain general principles you should consider as you pass upon this phase of the case.

Among the things which you may properly consider in determining the credibility of a witness is whether the witness has any motive or reason for being truthful or untruthful.

The witness's interest, if any, in the outcome of the case.

Whether there has appeared from the witness's attitude or conduct any bias, prejudice or feeling which may cause that person's testimony to be influenced.

Also, whether the testimony bears the earmarks of truthfulness.

Also, to what extent, if any, the testimony is

1  corroborated or confirmed by other testimony which is not
2  questioned or to what extent, if any, it's corroborated or
3  confirmed by known or admitted facts.

4        You may also consider the intelligence and mental
5  capacity of the witness and the witness's opportunity to have
6  accurate knowledge of the matters to which the person
7  testifies.  I instruct you that you may believe all that a
8  witness says or none or believe part and disbelieve part.  You
9  may consider the interest which the witness may have in your
10 verdict, the demeanor of the witness on the stand, the reasons
11 for his or her testimony, and the means by which the witness
12 may know the things to which he or she has testified.

13       If you find a witness is interested in your verdict,
14 it's your duty to scrutinize that testimony closely.  But
15 after you've done so and if you find that he or she is telling
16 the truth in whole or in part, then you would give that
17 testimony the same weight you would that of a disinterested
18 witness.  It's your duty, in short, to find the truth of this
19 matter.

20       If you'll excuse me just a second.

21       (Pause.)

22       THE COURT:  Thank you.

23       Now, then, the testimony of a witness may be
24 discredited or impeached by evidence showing that the witness
25 has been convicted of a felony, a crime for which a person may

1   receive a prison sentence of more than one year.  Prior
2   conviction of a crime that is a felony is one of the
3   circumstances which you may consider in determining the
4   credibility of a witness.  It is the sole and exclusive right
5   of the jury to determine the weight to be given to any prior
6   conviction as impeachment and the weight to be given to the
7   testimony of anyone who has previously been convicted of a
8   felony.

9          The testimony of an informant or an accomplice, that
10  is, someone who provides evidence against someone else to
11  escape punishment for his or her own misdeeds or crimes or for
12  other personal reason or advantage must be examined and
13  weighed by the jury with greater care than the testimony of a
14  witness who may not be so motivated.  Lisa Wentworth, Terri
15  Clark, William Townsend, and Sheila Hamby Sipes can all be
16  considered to be informants or accomplices in this case.  The
17  jury must determine whether a witness's testimony has been
18  affected by self-interest, by any agreement he or she has with
19  the government, or the witness's own interest in the outcome
20  of the case or by prejudice against the defendant.

21         The testimony of a drug or alcohol abuser must be
22  examined and weighed by you with greater care than the
23  testimony of a witness who has not abused drugs or alcohol.

24         You must determine whether the testimony of a drug
25  or alcohol abuser has been affected by drug or alcohol use or

1    the need for drugs or alcohol.

2          The testimony of a witness may be discredited or

3    impeached by showing that he or she previously made a

4    statement which is inconsistent with his or her present

5    testimony.  The earlier contradictory statement, if any, is

6    admissible only to impeach the credibility of the witness and

7    not to establish the truth of the earlier statement.  It's the

8    province of the jury to determine the credibility, if any, to

9    be given the testimony of a witness who has been impeached.

10          If a witness is shown knowingly to have testified

11   falsely concerning any material matter, you have a right to

12   distrust such witness's testimony in other particulars.  You

13   may reject all the testimony of that witness or give it such

14   credibility as you think it deserves.

15          Now, defendant, Roger Dale Franklin, has elected not

16   to testify in this case.  The Court instructs you that a

17   defendant such as Mr. Franklin has a constitutional right not

18   to take the stand and testify and not to speak at all or offer

19   any evidence, the burden of proof being entirely upon the

20   government.

21          You must draw, therefore, no adverse inference of

22   any kind from his exercise of his privilege not to testify.

23   This right is a fundamental one in America's criminal law and

24   one which cannot be disregarded by the jury at its pleasure.

25          Now, while we were hearing evidence, you were told

1   that the parties had agreed or stipulated to certain facts.
2   That simply means that they all -- that both parties accept
3   those particular facts.  There's no disagreement about them
4   and therefore no need for evidence beyond the stipulation
5   itself on the points stipulated.  You must accept those
6   stipulations as fact even if nothing more was said about them
7   one way or another.

8           Now, keep in mind that defendant is not on trial for
9   any offense not charged in this bill of indictment.  Nor
10  should you draw any inference concerning guilt or lack of
11  guilt of the crime charged, or any of them in this case, based
12  on evidence, if there was any, of the defendant's involvement
13  with any other offense not charged in this bill of indictment.
14  You must not convict the defendant unless the government has
15  proven beyond a reasonable doubt each and every essential
16  element of the particular crime charged in the indictment
17  against him which you are considering.

18          The punishment provided by law for the offense and
19  the various offenses charged in this indictment, should there
20  be a verdict of guilty of any offense, is a matter exclusively
21  within the province of the Court and should never be
22  considered by the jury in any way in arriving at an impartial
23  verdict as to the guilt or innocence of the accused as to any
24  count.

25          Thank you very much for your attention to this part

1  of the instructions.  We'll now move to oral arguments or
2  summation by the attorneys.  Under our rules the government
3  has the first opportunity to speak to you and make arguments
4  on behalf of the government.  Then the defendant will have,
5  likewise, an opportunity to make arguments on behalf of the
6  defendant.  Finally, the government will have an opportunity
7  to reply to the defense arguments and conclude the arguments
8  in that fashion.

9       Is the government ready to begin?

10       MR. KAUFMAN:  We are, Your Honor.

11       THE COURT:  You may.

12       MR. KAUFMAN:  Thank you.

13       All right, ladies and gentlemen.  The first count --
14  I'll foot stomp that first count for now.  The conspiracy
15  count.  What is a conspiracy?  A conspiracy is much like a
16  web.  There are a lot of different analogies we can make.
17  Ultimately, a conspiracy is merely a criminal agreement
18  between two or more people.  In this case, much like the web,
19  we have the individuals you see here.

20       You've heard testimony from Lisa Wentworth, from
21  Terri Clark, from Sheila Hamby Sipes, and from William "Bones"
22  Townsend.

23       We know that there are other co-conspirators
24  involved from the testimony you've heard.  For example, you've
25  heard about Destiny Miller.  She was at one of those four

traffic stops. And that there are others involved too, different types of customers, sources of supply. They're all part of this overall web. So what's been presented to you so far is just a little kind of a focused snapshot of the conspiracy that's involved here.

What's it about? Is it about drugs? Sure. You know, you heard that there were various people who were not only selling, sometimes they were selling, sometimes they were the buyer. Sometimes they were just selling. Sometimes they were also using. And that's -- you know, using our common sense, we know that that's to be expected here.

There's also the profit motive because ultimately that's the goal is to get money. In some cases, yes, to get more methamphetamine for use, what have you.

So with regard to the facts of the case, in the opening we had a chronological -- it was a summary. This is more chronological. You heard from different law enforcement officers. You might recall Officer Stacy Huffman from Morganton and she testified regarding counts two through four in the indictment that you'll be provided with and the instructions you'll be receiving. That first count is the over arching conspiracy.

So now going into the specifics.

When I say two through four, all of the counts, two through nine, are all relevant to the conspiracy. So when I

1    say two through four, it really should say one and two through
2    four.  But during the traffic stop she saw that handgun that
3    was protruding, that Taurus handgun, under Mr. Franklin's
4    seat.  There were the six baggies of methamphetamine and the
5    $22,945 in cash.
6              Ladies and gentlemen, you can conclude, by the way,
7    that large sums of cash are consistent with trafficking.
8              With regard to the August 19th, 2013, stop, you
9    heard from Officer Martin Crisp and he testified, again, while
10   relevant to the overall conspiracy as well, for the specific
11   substantive counts as we call them.  Those are counts five
12   through seven.  That was the stop where Lisa Wentworth was
13   present as well.  And you heard the testimony about how he
14   basically -- he tripped.  Did he actually trip or was it a
15   staged trip?  We don't know.  But what we do know is, where he
16   was they located several baggies of methamphetamine.  I
17   believe that Sergeant Barbour, the head of the Caldwell County
18   Sheriff's Office narcotics division, testified that it was
19   3 grams approximately of methamphetamine.  As you heard, .1,
20   .2 grams is a dosage unit.  So we're talking about dozens
21   of -- potentially dozens of dosage units here.
22             And then, of course, there was the .38 Special
23   revolver that you saw the photograph of.  Again, it just makes
24   sense that the firearm that he had -- you heard testimony,
25   too, from two of the witnesses that he always had a handgun

1  whether it was in his waistband when he got out of his vehicle

2  or under his seat or in his seat when he was in the vehicle.

3  September 3rd, 2013, this relates to the substantive

4  count of possession with intent to distribute as well as the

5  conspiracy count.  Again, Sergeant Barbour testified about

6  that.  And this is the one where Destiny Miller was there.

7  The methamphetamine was behind those red panels of the truck.

8  And whose truck again?  Mr. Franklin's truck.  The Dodge truck

9  that you saw in the photographs.

10  Again, Sergeant Barbour testified about the

11  November 20th, 2013, stop as well.  Same truck.  This is the

12  time that Ms. Sipes was there and she had 13.6 grams of

13  methamphetamine that, as she testified under oath, came from

14  Mr. Franklin who said, Here, take this, because he was worried

15  or aware that law enforcement may be on to them.  And that he

16  had, again, $1,175 in cash.

17  With regard to the co-conspirators, again, they --

18  you can look through your notes.  The amount -- threshold that

19  you'll be asked to determine among the various possibilities

20  that we're submitting to you very clearly established by the

21  evidence in this case is 500 grams.  You heard about the

22  periods of time and the amounts that they were receiving from

23  Mr. Franklin each time.  We're talking about well over

24  500 grams.  And you could conclude, in fact, it's tenfold

25  that.  For example, Ms. Wentworth, Mr. Franklin's

1  co-conspirator, she testified that she actually even has taken
2  responsibility herself for 1,500 grams as part of her plea.
3  Ms. Clark was over 500 grams. And Mr. Townsend over
4  5,000 grams. We submit that's certainly 500 grams, that
5  threshold that we're asking you, the jury, to conclude is
6  easily met.
7          With regard to the law, yes, we have nine counts for
8  you to deliberate on. And in the prior slides -- I won't take
9  up much time on this slide, but in each of those you could see
10  how the witnesses match up, their testimony matches up to
11  specific counts in this indictment.
12         With regard to liability, there are certain elements
13  that you'll be asked to consider. And the first one is that
14  there was an agreement. We know because not only was he
15  with -- in possession of distribution amounts of
16  methamphetamine with co-conspirators, you've heard from
17  four -- three or four, depending on how you look at it, of
18  these co-conspirators and their testimony.
19         Knowingly joining. Of course. In fact, if
20  anything, he was the source of supply. So did he know what he
21  was doing? Of course.
22         The object was to distribute methamphetamine.
23  Again, he possessed it. You heard about the ongoing business.
24  This isn't even just a one-day, one-time conspiracy. Hey,
25  let's do this thing this one time. This is over a course of

1  time.

2       And then that they knew the substance was meth.  Of
3  course they knew because that was the whole goal of what was
4  happening here.

5       With regard to what we call PWID, which is
6  possession with intent to distribute charges, those times that
7  he was actually in possession of it.  And I put in parentheses
8  here "constructive."  You'll hear instructions about actual
9  possession and constructive possession.  The bottom line is if
10 you have the ability to exercise dominion and control, meaning
11 can you -- do you have the ability to get it?  That's really
12 the easiest way to put it.  Then that means you constructively
13 possessed it even if it isn't in your own hands.

14      The knowledge of the possession.  Again, the whole
15 point is he was a distributor over the course of the
16 conspiracy.  So for the one-time possession with intent to
17 distribute, it's clearly met.

18      Again, the intent and the quantity which you'll be
19 asked about as well.  In this case for each of these PWID
20 charges, these substantive charges, the allegation is that it
21 was a mixture and substance containing any amount of
22 methamphetamine.  There's not even a threshold that you will
23 have to hit for those.

24      With regard to possession of the firearm, there are
25 two different types, two of each type.  That is, one is just

1    possession of a firearm by a convicted felon.  The issue isn't
2    whether it's technically a firearm or if it affected
3    interstate commerce.  There were stipulations to basically all
4    of that.  Whether he is a felon.  He stipulated to those and
5    we appreciate that.  Really, the only question is and the
6    element that he's challenging is the knowing possession.  Did
7    he knowingly possess it?  And we submit of course he knowingly
8    possessed it.  His whole purpose was to have it in case
9    something went bad on a drug deal or if he was going to be
10   robbed or anything of that nature.  That's the possession of
11   firearm by a convicted felon.

12          And then there's the other type of gun charge which
13   is possession of a firearm in furtherance of drug trafficking.
14   That is, did that -- did the gun on each of those two
15   occasions, did it somehow help him in his drug trafficking?
16   That is, did it help protect him, embolden him to do his
17   criminal acts?  If the answer is yes, then that's guilty for
18   that.

19          So just to summarize, in the opening statement we
20   said there were four seizures.  There were firearms on two of
21   those occasions.  You've heard from law enforcement officials
22   testifying under oath as well as co-conspirators, four of
23   them.  At the end of the day, ladies and gentlemen, we will be
24   asking you, again, to return a finding and a verdict of guilty
25   on all nine counts.  Thank you.

1          THE COURT:  Mr. Thorsen.

2          MR. THORSEN:  Thank you, Your Honor.

3          Ladies and gentlemen of the jury, the government has

4    proved nothing.  They didn't have anyone, no officer said they

5    found methamphetamine on Roger Franklin.  No officer said they

6    found a gun on Roger Franklin.  Yes, he got a ride from

7    somebody one day and there was a gun underneath the seat he

8    was sitting in.  Does that make him in possession of the car?

9    Was he supposed to search the car before he got in the car and

10   see if there was any gun in the car?  That wasn't Roger's gun.

11   There was no evidence showing it was Roger's gun.  It was

12   under the seat he was sitting in.

13         The methamphetamine, it wasn't Roger's

14   methamphetamine.  It wasn't on Roger.  Was there any

15   laboratory evidence showing, hey, his DNA, his fingerprints,

16   whatever?  The government doesn't need CSI proof, but they

17   need proof.  They can't just say, hey, you sat in a car once

18   and there was a gun under the seat; therefore, we're going to

19   lock you up for years and years and years.  That's not the way

20   it works.  You need proof beyond a reasonable doubt.

21         And who are the people that the government's putting

22   up here?  They're a bunch of people who are up here trying to

23   say Roger Franklin is a drug dealer so they can get time cuts.

24   And those people were drug users.  They were drug dealers.

25   And some of them were people Roger had hung out with,

surrounded himself around.  Roger has a problem, he has a
drinking problem, and he fell in with this one woman, Lisa
Wentworth.  Lisa Wentworth was a meth dealer, meth addict.
She moved into his house.  She was taking care of his dad.
And she thought she could deal meth out of the house and
somehow Roger, she could put the blame for it on him.

It's not the case.  There was no controlled buy from
Roger ever.  Did the government ever say, okay, we're going to
go buy some meth from Roger since he's a meth seller?  Did
they ever do that?  No, there was no controlled buy from
Roger.  They didn't have cameras of him selling meth.  They
didn't have audiotape of him arranging a meth deal.  They
don't have pictures of him selling meth.  They never bought
any meth from him.  He's not a drug dealer.

Each of you was carefully chosen to be on this jury
because you all get to decide what the facts are and apply it
to the law.  Each of your decisions is going to be important.
And when you go back to the jury room, hold up for what you
feel the facts show.  Does it meet the proof of beyond a
reasonable doubt?  Are you fully satisfied that those guns
were his?  Was there any DNA on those guns?  Were they
registered to Roger?  Or were they just found near Roger?

When -- yes, August 19th, 2013, Lisa Wentworth had
scales in her pocketbook.  Lisa Wentworth had meth on her
person.  Lisa Wentworth had a pipe.  What did Roger have?

1  Nothing.  Roger, she says, was passed out in the car.  He was

2  drunk.  Officer Crisp couldn't even remember if Roger was

3  drunk or not.  Yet he -- just another case for him.

4          Officer Crisp, he did not see the drugs that he says

5  some officer said -- we have a picture of some drugs in a

6  field.  Okay.  We have some pictures of drugs in a field.  We

7  stipulate that it's meth.  We're not trying to say, hey, oh,

8  prove it all, prove it all.  Hey, somebody had some meth out

9  there.  Your decision is has the state proven beyond a

10 reasonable doubt that Roger -- that was Roger's meth?

11         Lisa Wentworth had gotten out of the car after she'd

12 been stopped after she'd been driving.  She's getting out of

13 the car.  She had some of the meth on her that they found in

14 her pocketbook.  She could have thrown all that meth while she

15 got out of the car and put it there.  That meth was not

16 Roger's.  He's not been caught with any meth because he's not

17 a meth dealer.

18         On September 3rd the government was trying to do a

19 controlled buy.  They said they had a confidential informant

20 who said, hey, I know I can get some meth from this woman,

21 Destiny Miller.  Destiny Miller, we didn't ever talk to

22 Destiny Miller, but we heard from a confidential informant who

23 said they could get meth from Destiny Miller and had gotten

24 meth from Destiny Miller in the past.

25         When Destiny Miller showed up, she did have Roger

1   with her.  Okay.  But was there meth on Roger?  No.  Was there

2   a gun on Roger?  No.  Destiny Miller showed up at the

3   confidential informant's place.  She got out of the car.  She

4   went into the apartment with the confidential informant.

5   Roger went off to take a leak behind another building.  The

6   people who were watching the controlled buy, they get -- they

7   find out that Destiny Miller is in there.  She has some meth.

8   They get the alert saying there's meth and they come back to

9   the truck.  Destiny Miller and the confidential informant come

10  back to the truck.  The confidential informant is not sure,

11  but Destiny Miller is hiding the meth at that time in the --

12  or doing something with the meth in the panels of the door in

13  the truck.  She's reaching in the truck doing something.

14         It's not on Roger.  There's no evidence that his DNA

15  is on this meth.  He doesn't say it's his meth.  There is no

16  evidence beyond a reasonable doubt that that meth is related

17  to Roger.  It's Destiny Miller's meth.  She's the one who had

18  the meth.  She's the one who was talking to the confidential

19  informant.  She was the one selling meth that day.

20         November 20th when there's the traffic stop, it's

21  Sipes, Sheila Sipes, who has the meth.  She has meth in her

22  brassiere.  She has meth in her pants.  There's no meth on

23  Roger.

24         July 6th, that's when Roger was in a truck.  Roger

25  was not driving.  The gun was not on him.  The drugs were not

1  on him.  The car was not his.  But Roger, hey, he's guilty of

2  not looking in the seat before he got into the car.

3          William Townsend, Terri Clark, Lisa Wentworth, they

4  all have plea agreements with the state.  They're all looking

5  to get a time cut by saying, oh, we brought in some other meth

6  dealer.  Here, get this guy because we used to hang out with

7  this guy and you'll convict him because we're all meth

8  dealers.  We can convince the jury to say he's a meth dealer

9  too.  That's not the case.

10         Lisa Wentworth, she's an addict.  She misrepresents

11  facts.  She admits she was selling all of Roger's stuff while

12  he was in jail.  She's not credible.  They all had motivation

13  to testify, to make things up.

14         We had Sheila Sipes.  She's the one who came in

15  here, said she's been promised that if she testified today,

16  she would not be prosecuted.  Are you convinced based on her

17  testimony that he's guilty beyond a reasonable doubt?  Are you

18  fully satisfied?  This is not enough for guilt.  We're going

19  to -- we're talking about locking someone up for years and

20  years and years.  You need to be fully satisfied before you

21  find someone guilty.

22         They could have done a controlled buy.  They could

23  have found meth on him.  They could have done something, but

24  not just come in here and say, hey, we found you near some

25  meth and we have some drug dealers who want to get a time cut

1    by telling you -- by coming to court and saying they were in
2    here with you.

3           Ladies and gentlemen, this is not proof beyond a
4    reasonable doubt.  It should be not guilty, not guilty, not
5    guilty, not guilty.  But take your time.  Consider all of the
6    different charges.  Consider how there is no evidence, no
7    evidence, no evidence, especially as to the guns.  Think about
8    why is it that there's not something tying him to these guns
9    rather than, oh, they were in the same car as he was.  They
10   weren't next to you, but we're going to say that they're your
11   guns.  They're in your possession.

12          This is not where -- this is not the evidence where
13   we're going to send someone to jail, to prison, for years and
14   years and years.

15          MR. KAUFMAN:  Objection.

16          THE COURT:  Overruled.

17          MR. THORSEN:  This is -- this is something where you
18   come back and say not guilty because you're not fully
19   satisfied.  Guilty means yes, the state has proven -- the
20   government has proven it beyond a reasonable doubt.  The
21   government has all these resources to wait, wait, and wait
22   until they bring the case.  They need to keep on waiting
23   before they can get a guilty verdict for Roger Franklin here.
24   This is not evidence you can send someone to prison on.  Thank
25   you.

1          MR. KAUFMAN:  Ladies and gentlemen, the burden of

2    beyond a reasonable doubt, we acknowledge it.  We welcome it.

3    And we submit that we have met it and then some.

4          The defense's position is that Mr. Franklin must be

5    the unluckiest guy in the world.  I mean, come on.  You've got

6    three law enforcement officers who are going to try and put

7    drug seizures on to him on four different occasions.  You've

8    got four different people who are going to testify and lie

9    under oath in front of you and be so convincing to make you

10   believe that what they're telling you is the truth.  So all of

11   the seven witnesses must be lying and he's just incredibly

12   unlucky.  We submit that is preposterous.

13         First of all, the defense talked about the gun under

14   the seat.  He should have searched the vehicle before getting

15   in.  Well, again, we've heard testimony from witnesses that he

16   always had a firearm.  It makes sense.  And it also makes

17   sense that it would have been near him but at enough of a

18   distance so he could claim he didn't have responsibility like

19   the gun that was with -- during the stop with Lisa Wentworth.

20   So it was closer to her and she took it because they were in a

21   conspiracy together and she knew he was a convicted felon and

22   he'd be in trouble for just the mere presence of the gun,

23   forgetting about even the methamphetamine, right?  So it just

24   makes sense that he's going to want to distance himself as

25   best possible.

1    And he's also going to want to have -- he may want
2 to hold the money because there is nothing illegal about money
3 per se.  It's illegal to make money by selling drugs, but to
4 simply possess money is not something that's illegal.  So it
5 makes sense he would be holding the money ultimately with the
6 goal of the conspiracy and he would want the gun to be
7 disassociated from himself, maybe closer to the driver, the
8 various females from the testimony you've heard about.
9    Or the drugs.  Same thing with Ms. Sipes.  She took
10 it, you know.  I mean, when -- that's something I want to
11 touch upon too.  All of these witnesses when they testified,
12 you've got to -- they were under oath, sure, but you've also
13 got to look at them.  And you are the judges here.  Judge
14 Voorhees is overseeing this case, but you are the judges of
15 the facts.  You are the judges who determine whether they were
16 credible when they were here on the witness stand.  And you
17 saw them.  What was their posture like, their facial
18 expression, what they said, their tone of voice, and even the
19 content of what they said?  Didn't it all ring true?  Wasn't
20 it great?  I mean, they would admit things.  They would admit,
21 yeah, I was selling again.  I'm an addict.  I was taking
22 drugs.  They admitted things that don't make them look so
23 good.  It goes to their credibility.
24    And then there would be cross examination questions.
25 Are you a -- are you, Ms. Clark and Ms. Wentworth, aren't you

1   good friends?  What are you?  Acquaintances, associates?  They
2   both when they're being cross examined about things by the
3   defense, they have consistent answers.  Did you use drugs
4   together?  No.  I was an intravenous user.  She was a smoker.
5   I mean, all of the things that even the defense was asking on
6   cross examination proved their credibility and what?  That
7   word that Sergeant Barbour talked about:  Corroboration.
8   Corroboration takes many forms.  Corroboration can be the fact
9   that he was found in possession of methamphetamine four times.
10  It can also be one witness saying something consistent with
11  another witness, the co-conspirator's testimony.

12          With regard to the methamphetamine not being
13  Mr. Franklin's, again, unluckiest man in the world.  In his
14  Ford truck inside the panels on both sides where the passenger
15  and the driver are were six bags and two bags of
16  methamphetamine.  Wow.  Maybe he should search his own car
17  before he gets into it if people are going to be hiding things
18  in there without his knowledge.  Come on, folks.  I mean,
19  that's his truck.  That's his methamphetamine.

20          And with regard to the DNA, in voir dire we all
21  talked about this.  It's out in the open.  This is not CSI.
22  This is the real world.  This is good old-fashioned police
23  work and the seizures are what they are.  There is no
24  obligation to have some sort of magical DNA test or, you know,
25  other things.  There were questions about body wires and

1  cameras and, well, in the real world you just can't do all of
2  these things.

3  　　　　With regard to the drugs in the field, there was
4  testimony it was in his path.  Ms. Wentworth, remember, she
5  said she went to the back of the truck and that's where she
6  was.  She didn't go across the field.  The only person who
7  went across the field was Mr. Franklin.

8  　　　　Oh, you know, and Officer Greene, you heard about
9  Cody Greene who was with Officer Crisp.  So is the argument
10 that it was Mr. Franklin's?  Yes.  Is it that the meth was
11 planted by Officer Greene?  Huh-uh.  And the third
12 possibility, that somebody else had just abandoned six bags of
13 methamphetamine in a field.  You've heard about how valuable
14 this is.  Even small quantities are valuable.  Multiple bags,
15 there were six bags of methamphetamine that were left in that
16 field abandoned by a third party who just didn't really care
17 to come and get it back.  That doesn't make sense either.

18 　　　　So really, there's only one conclusion about this
19 methamphetamine and you don't need DNA about it.  You don't
20 need to have some, you know, big brother filming of what
21 happened in that field.  You know where that meth came from.

22 　　　　And with regard to the testimony of the
23 co-conspirators.  Again, the suggestion that they're lying to
24 get a cut doesn't make any sense because, first of all, they
25 had everything to lose by telling a lie.  You heard they lose

1 their plea agreement. So any benefit they might be able to

2 get they don't get. And they can get additional time. Now,

3 they didn't use the words, but we all know. You can't lie

4 under oath. It's perjury, right? So they'd get additional

5 time. And you heard that. I'd get additional time.

6      With regard to Ms. Sipes, is anybody here saying,

7 oh, well, because the United States didn't charge her with

8 trafficking because she took the drugs from Mr. Franklin on

9 one occasion, is that a bad thing about her credibility? No.

10 And by the way, defense says by testifying there aren't going

11 to be charges brought against her. Remember what she said

12 too? There are a couple conditions. She's got to tell the

13 truth and can't get it any other trouble.

14      THE CLERK: Five minutes.

15      MR. KAUFMAN: Thank you, ma'am.

16      Doesn't that make sense? Isn't that just? And with

17 regard to the truth, they all know what their obligation is.

18 It's not to say something that's just going to get a poor

19 innocent man convicted. It was, I believe, Ms. Clark who

20 testified that she knew that there were two rules: Be honest

21 and be honest. That's what she knew to do. And if you're

22 not, then you're really in big trouble. So they are credible.

23      And by the way, with regard to a sentencing cut,

24 whatever that means, well, you heard consistent testimony.

25 Who makes that call? The judge who's sitting here listening

1   to their testimony and is also, like you, evaluating if they
2   appear to be truthful.

3            Ladies and gentlemen, I won't go through every point
4   that the defense was trying to make because we can start to
5   look at -- like when you look at a painting and you get really
6   close, you can try to focus in on one little piece, but you
7   really have to take a step back to appreciate what the picture
8   is and what was happening.  And when you do that in this case,
9   you are in a situation where you have a man who was
10  trafficking in a horrible drug for an extended period of time
11  with numerous people.  He was caught on four different
12  occasions.  And his co-conspirators took that stand under oath
13  and admitted that they had done it.  They're taking
14  responsibility for it.  And I submit they credibly told you
15  about these details that established the conspiracy, all of
16  the possession with intent to distribute and the firearms
17  possession as part of the conspiracy.  Thank you.

18           THE COURT:  Thank you, gentlemen, for the arguments.
19           Now, members of the jury, anybody need a break at
20  this point?  We'll go ahead with the instructions and you can
21  let me know if you need a break.  It will take a little while,
22  but we'll probably be done by 5:00.  If not, maybe somewhat
23  short of that.  But I will read to you the counts of the
24  indictment, then I'll talk about each count, give you the
25  essential elements of the offenses.

1        You will have a copy of the bill of indictment with
2   you in the jury room.  You'll also have available to you a
3   copy of the jury instructions that I gave to you earlier and
4   the ones I'm about to give to you.  You'll have a hard copy
5   and it will also be available on the video screen for exhibits
6   that is available there in the jury room.

7        Count one.  Again, the indictment is not evidence.
8   It alleges that from in or about 2007 to in or about 2014, in
9   Caldwell County and Burke County, within the Western District
10  of North Carolina, and elsewhere, the defendant, Roger Dale
11  Franklin, did knowingly and intentionally combine, conspire,
12  confederate, and agree with other persons known and unknown to
13  the grand jury to distribute and to possess with intent to
14  distribute a mixture and substance containing a detectable
15  amount of methamphetamine, a Schedule II controlled substance,
16  in violation of Title 21, U.S. Code, Sections 846 and
17  841(a)(1).

18       It is further alleged that with respect to the
19  conspiracy offense charged in count one, that 500 grams or
20  more of a mixture and substance containing a detectable amount
21  of methamphetamine, a Schedule II controlled substance, are
22  attributable to and were reasonably foreseeable by defendant,
23  Roger Dale Franklin.  Accordingly, Title 21, U.S. Code,
24  Section 841(b)(1)(A) is applicable to defendant, Roger Dale
25  Franklin.

1      You'll note that some of the counts in the bill of
2 indictment charge the offenses were committed on a certain
3 date or on or about or in or about certain dates.  Proof need
4 not establish with certainty the exact date or dates of the
5 alleged offense.  It's sufficient if the evidence in the case
6 establishes beyond a reasonable doubt that the offense in
7 question was committed on a date reasonably near the date or
8 dates alleged.

9      Now, in count one defendant is charged under
10 Section 846 which provides that any person who conspires to
11 commit any offense defined in this subchapter shall be
12 subjected to the same penalties as those prescribed for the
13 offense, the commission of which was the object of the
14 conspiracy.

15      One of the offenses defined in the subchapter is
16 841(a)(1) which says, it shall be unlawful for any person
17 knowingly or intentionally to possess with intent to
18 distribute or dispense a controlled substance.

19      For you to find the defendant guilty, then, of the
20 offense charged in count one, the government must prove the
21 following essential elements beyond a reasonable doubt before
22 there could be a conviction.

23      For your information, the first essential element
24 has to do with the existence of a conspiracy; the second with
25 membership in a conspiracy; the third with the alleged object

1  of the conspiracy; the fourth has to do with defendant's

2  knowledge.

3          More particularly, here are the essential elements

4  the government must prove beyond a reasonable doubt before

5  there could be a conviction.

6          First, that the conspiracy described in count one of

7  the bill of indictment was an agreement or understanding

8  between two or more persons, that the conspiracy was willfully

9  formed, and that it was existing at the time alleged in the

10 bill of indictment.

11         Second, that at some time during the existence or

12 life of the conspiracy, the defendant knew the purpose of the

13 agreement or understanding and willfully joined the

14 conspiracy.

15         Next, that the object of the conspiracy was to

16 violate the federal Controlled Substances Act by way of

17 possessing with the intent to distribute a Schedule II

18 controlled substance, either actual methamphetamine or a

19 mixture and substance containing a detectable amount of

20 methamphetamine, or both, with a weight as alleged in the

21 special verdict form.

22         And lastly, that defendant knew the substance

23 involved in the conspiracy as described in the indictment was

24 a controlled substance.

25         So I'll now define certain of the terms used in

these essential elements. You would apply these definitions as you consider the evidence. If I do not define certain words, you would assign to them their ordinary, everyday meanings.

A criminal conspiracy is an agreement or a mutual understanding knowingly made or knowingly entered into by at least two people to violate the law by some joint or common plan or coercive action. A conspiracy is in a very true sense a partnership in crime.

A conspiracy or agreement to violate the law, like any other kind of agreement or understanding, need not be formal, written or even expressed directly in every detail. To prove the existence of a conspiracy or an illegal agreement, the government is not required to produce a written contract, and that would be between the parties, or even produce evidence of an express oral agreement spelling out all of the details of the understanding.

Moreover, to prove that a conspiracy existed, the government is not required to show that all of the people named in the indictment as members of the conspiracy were, in fact, parties to the original agreement or that all of the members of the alleged conspiracy were named or charged or that all of the people whom the evidence shows were actually members of the conspiracy agreed to all the means and methods set out in the indictment.

1        Instead, the government must prove that the
2   defendant, and at least one other person, knowingly and
3   deliberately arrived at an agreement or understanding that
4   they and perhaps others would violate the law by means of some
5   common plan or course of action as alleged in count one.  It
6   is proof of this conscious understanding and deliberate
7   agreement by the alleged members that should be central to
8   your consideration of the charge of conspiracy.  Unless the
9   government proves beyond a reasonable doubt that a conspiracy
10  as just explained actually existed, then you must acquit the
11  defendant of the charge in count one.

12       If you should conclude that the conspiracy did exist
13  as alleged, you would then determine whether the defendant
14  knowingly and willfully became a member of the conspiracy.
15  Before the jury may find that the defendant or any other
16  person became a member of the conspiracy as charged in count
17  one, the evidence must show beyond a reasonable doubt that the
18  defendant knew the purpose or goal of the agreement or
19  understanding and deliberately entered into the agreement,
20  intending in some way to accomplish the goal or purpose of the
21  common plan.

22       And if the evidence establishes beyond a reasonable
23  doubt that the defendant knowingly and deliberately entered
24  into an agreement to possess with the intent to distribute
25  methamphetamine, the fact that the defendant did not join the

1   agreement at its beginning or did not know all the details of

2   the agreement or did not play a major role in accomplishing

3   the unlawful goal is not important to your decision regarding

4   membership in the conspiracy.

5           On the other hand, certain things do not taken alone

6   make someone a member of a conspiracy.  Merely associating

7   with others and discussing common goals, mere similarity of

8   conduct between or among such persons, merely being present at

9   the place where a crime took place or is discussed, or even

10  knowing about criminal conduct does not by itself make someone

11  a member of a conspiracy.

12          If you concluded that the conspiracy did exist as

13  alleged and that defendant knowingly and willfully became a

14  member of it, then you should next determine whether or not an

15  objective or goal of the alleged conspiracy was to possess

16  with intent to distribute the drug as alleged.  Basically,

17  what you are determining in this regard is whether the

18  conspirators intended to possess this drug for their own use

19  or whether they intended to possess it for later sale or

20  transfer.  Referring, of course, to methamphetamine.  Often it

21  is possible to make this determination from the quantity of

22  drugs involved.  An intent to distribute or transfer may be

23  inferred, for example, where the quantity of drug discovered

24  was greater than that which would be used for personal

25  consumption.

Ultimately, the government must prove beyond a reasonable doubt that a conspiracy was willfully formed and had as its purpose the possession with intent to distribute methamphetamine. You should make your determination as to the purpose of the conspiracy from all the evidence presented. Keep in mind that there may be a conviction as to the conspiracy count even though the conspirators may not have succeeded in accomplishing their common object or purpose in some way or ways and, in fact, may have failed in accomplishing it.

I'll now define the word "possession." It comes up as to count one where the government alleges a conspiracy to possess methamphetamine with the intent to distribute it.

The word "possess" means to own or to exert control over. The word "possession" can take on several different but related meanings.

The law recognizes two kinds of possession: Actual and constructive. A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it. A person who although not in actual possession knowingly has both the power and the intention at a given time to exercise dominion or control over a thing either directly or through another person or persons is then in constructive possession of it.

The law recognizes also that possession may be sole

1  or joint.  If one person alone has actual or constructive
2  possession of a thing, then possession is sole.  If two or
3  more persons share actual or constructive possession of a
4  thing, then possession is joint.

5         You may find that the element of possession as that
6  term is used in these instructions is present if you find
7  beyond a reasonable doubt that the possession in question was
8  actual or constructive possession either alone or jointly with
9  others.

10        The phrase "with intent to distribute" means to have
11  in mind or to plan in some way to deliver or transfer
12  possession or control over a thing to someone else.  In
13  attempting to determine the intent of any such person, you may
14  take into consideration all of the facts and circumstances
15  shown by the evidence received in the case concerning that
16  person.  In determining a person's intent to distribute
17  controlled substances, you may consider, among other things,
18  the purity of the controlled substance, the quantity of it,
19  the presence or absence of equipment used in the processing or
20  sale of controlled substances, and the presence or absence of
21  large amounts of cash or weapons.

22        For you to find the defendant guilty of the charge
23  in count one, the government must prove beyond a reasonable
24  doubt the third essential element, that the object of the
25  conspiracy was to possess a controlled substance with the

1  intent to distribute it as alleged.

2          Defendant is charged in count one with conspiracy to

3  possess with intent to distribute methamphetamine.  You are

4  instructed as a matter of law that methamphetamine is a

5  Schedule II controlled substance.

6          Next, you would turn your attention to the issue of

7  the type and quantity of illegal drugs involved.  As to the

8  drug charged in the indictment, you must determine if the

9  substance involved was methamphetamine.  You'll be provided

10  with a special verdict form that specifically addresses the

11  drug and quantity to be considered if you find drugs were

12  involved as alleged.

13          Now, in determining the drugs involved in the

14  conspiracy as a whole, if you reach that point you will then

15  be asked to determine the drug quantity attributable to this

16  defendant.  In order to determine the quantity of drugs

17  attributable to an individual co-conspirator, you must

18  determine the scope of criminal activity the defendant agreed

19  to jointly undertake as well as the conduct of other

20  co-conspirators that was in furtherance of the conspiracy and

21  reasonably foreseeable to the particular defendant, if any.

22          The defendant has the burden of proof -- strike

23  that.

24          The government has the burden of proof, obviously,

25  on this issue as on all issues in this case and must establish

1    beyond a reasonable doubt the quantity of drugs that this
2    particular defendant should be held responsible for.  Your
3    decision as to drug quantity, if you reach this issue for the
4    defendant, must be unanimous.

5            I will explain the applicable principles in more
6    detail.  As I said, you must first consider the scope of
7    criminal activity that this particular defendant agreed to
8    jointly undertake by becoming a member of the conspiracy.

9            Before the charged offense may be worded broadly --
10   or rather, because it may be worded broadly and include the
11   conduct of many participants over a period of time, the scope
12   of the criminal activity jointly undertaken by the defendant
13   is not necessarily the same as the scope of the entire
14   conspiracy.  This makes sense when you consider the different
15   roles that the members of a conspiracy may have in any given
16   case.

17           Generally, in considering what criminal activity an
18   individual defendant may have agreed to jointly undertake, you
19   will look to the scope of the specific conduct and
20   objections -- objectives or goals, aims or purposes embraced
21   by the defendant's agreement.

22           Next, you may -- or rather, must consider the
23   conduct of defendant's co-conspirators, that is, other members
24   of the conspiracy.  Whether any other co-conspirator's actions
25   may be attributable to this defendant depends upon the

1   following:

2          Whether the co-conspirators' actions were in
3   furtherance of the conspiracy; and

4          Second, whether the co-conspirators' actions were
5   reasonably foreseen by the defendant as necessary or natural
6   consequences of the co-conspirators' actions.

7          A co-conspirator's actions are considered to be in
8   furtherance of the conspiracy if the actions occurred during
9   the commission of the offense of conviction, in preparation
10  for that offense or in the course of attempting to avoid
11  detection or responsibility for that offense.

12         In order to hold an individual defendant or
13  co-conspirator responsible for the acts of other members of
14  the conspiracy, the acts must be reasonably foreseeable to
15  that defendant.  Acts are reasonably foreseeable if they can
16  be reasonably foreseen as the necessary and natural
17  consequence of the conspiracy.

18         In evaluating whether the actions of another
19  co-conspirator were reasonably foreseeable as a necessary or
20  natural consequence of the conspiracy, you may consider the
21  scope of the agreement between the specific individual
22  defendant and the co-conspirator whose actions or conduct you
23  are considering.

24         Keep in mind that use of the word "reasonably"
25  contemplates that you will consider what a reasonable person

1  in the same or similar circumstances would have understood the
2  natural consequences to be.  In other words, you are not to
3  consider the subjective beliefs of the particular defendant if
4  you find them to be unreasonable.

5          The government must show beyond a reasonable doubt
6  that defendant participated in the alleged conduct knowingly.
7  This is called the mental element of this offense.

8          The word "knowingly" as used in these instructions
9  to describe the alleged state of mind of the defendant means
10 that he was conscious and aware of his actions, realized what
11 he was doing or what was happening around him, and did not act
12 because of ignorance, mistake or accident.

13         Knowledge may be proven by defendant's conduct and
14 by all the facts and circumstances surrounding the case.  The
15 purpose of adding the element knowingly is to ensure that no
16 one will be convicted due to mistake or accident or other
17 innocent reason.

18         The term "willfully" as used in these instructions
19 to describe the alleged state of mind of the defendant means
20 that he knowingly performed an act or failed to act
21 deliberately and intentionally or on purpose as contrasted
22 with accidentally, carelessly or unintentionally.

23         Now, evidence has been received in this case that a
24 certain person or persons who are alleged to have been
25 co-conspirators with the defendant have done or said things

during the existence or life of the alleged conspiracy in order to further or advance its goals.  Such acts and statements of alleged co-conspirators may be considered by you in determining whether or not the government has proven the charges in count one against defendant.  Since these acts may have been performed or these statements may have been made outside the presence of defendant and even done or said without defendant's knowledge, these acts or statements should be examined by you with particular care before considering them against the defendant.

But if you find that the acts and statements were in furtherance of the goals of the conspiracy and you find that defendant was or became a member of that conspiracy, then you may consider those acts and statements as evidence against the defendant.

So concluding as to count one and summarizing again and going back to the essential elements, I charge you that if you find from the evidence beyond a reasonable doubt that within the Western District of North Carolina and on or about the date or dates alleged:

First, that the conspiracy described in count one was an agreement or understanding between two or more persons, that the conspiracy was willfully formed and that it was existing at the time alleged in the bill of indictment;

Second, that at some time during the existence or

1    life of the conspiracy, the defendant knew the purpose of the
2    agreement or understanding and willfully joined the
3    conspiracy;

4           Third, that the object of the conspiracy was to
5    violate the federal Controlled Substances Act by way of
6    possessing with intent to distribute a Schedule II controlled
7    substance, either actual methamphetamine or a mixture and
8    substance containing a detectable amount of methamphetamine,
9    or both, with a weight as found in the special verdict form;
10   and

11          Four, that the defendant knew the substance involved
12   in the conspiracy as described in the bill of indictment was a
13   controlled substance, and if you so find, then you would --
14   then it would be your duty to return a verdict of guilty as
15   charged in count one.  However, if you do not so find or if
16   you have a reasonable doubt as to one or more of the essential
17   elements of the crime charged, then it would be your duty to
18   give the defendant the benefit of that doubt and return a
19   verdict of not guilty.

20          Now, moving to count two.  Defendant is charged also
21   under Title 21, Section 841.  It alleges that on or about
22   July 6, 2013, in Burke County, within the Western District of
23   North Carolina, and elsewhere, the defendant, Roger Dale
24   Franklin, did knowingly and intentionally possess with intent
25   to distribute a controlled substance, that is, a mixture and

substance containing a detectable amount of methamphetamine, a
Schedule II controlled substance, in violation of Title 21,
U.S. Code, 841(a) and in violation of Title 21:841(b)(1)(C).

Now, then, 841 provides, it shall be unlawful for
any person knowingly or intentionally to distribute or possess
with intent to distribute a controlled substance.

So for you to find the defendant guilty of the
offense charged in count two, the government must prove the
following essential elements beyond a reasonable doubt:

That on or about the date alleged, within the
Western District of North Carolina, that defendant possessed a
narcotic controlled substance, methamphetamine;

Second, that defendant had knowledge of the
possession of a controlled substance; and

Third, that defendant had the intent to distribute
the narcotic controlled substance.

Now, then, you are to use the definitions I gave you
earlier to define "possession" because they apply here.
Likewise "with intent to distribute," "controlled substance,"
and the terms "knowingly" and "willfully." And you would also
use the same instructions I gave you regarding drug type.

So, members of the jury, you having heard the
necessary definitions, I charge you that if you find beyond a
reasonable doubt that on or about the date alleged, within the
Western District of North Carolina, that date being July 6,

1   2013, that the defendant possessed a narcotic controlled

2   substance, methamphetamine;

3          That defendant had knowledge of the possession of

4   the controlled substance; and

5          Third, that the defendant had the intent to

6   distribute the narcotic controlled substance, then it would be

7   your duty to return a verdict of guilty as charged in count

8   two.  However, if you do not so find or if you have a

9   reasonable doubt as to one or more of the essential elements

10  of the crime charged, then it would be your duty to give the

11  defendant the benefit of that doubt and return a verdict of

12  not guilty.

13         Defendant is charged in count three.  That comes

14  under Section 924(c) and Section 2 of Title 18.

15         924(c) reads as follows:  Any person who, during and

16  in relation to any drug trafficking crime for which the person

17  may be prosecuted in a court of the United States, uses or

18  carries a firearm or who in furtherance of any such crime

19  possesses a firearm shall be guilty of an offense against the

20  United States.

21         Section 2 reads:  Whoever commits an offense against

22  the United States or aids, abets, counsels, commands, induces

23  or procures its commission is punishable as a principal.

24         Now, the essential elements.  For you to find the

25  defendant guilty of the charge in count three of the bill of

1  indictment, the government must prove the following essential
2  elements:
3          First, that defendant committed the drug trafficking
4  crime possession with intent to distribute methamphetamine as
5  described in count three;
6          Second, defendant possessed a firearm in furtherance
7  of the commission -- strike that.  I'm going to start over on
8  that and I'm going to read to you count three.  Again, this is
9  not, as with all counts in the indictment, not evidence.
10          Count three alleges that on or about July 6, 2013,
11  in Burke County, within the Western District of North
12  Carolina, and elsewhere, the defendant, Roger Dale Allen
13  [sic], in furtherance of a drug trafficking crime, that is,
14  possession with intent to distribute methamphetamine, a
15  violation of Title 21, U.S. Code, Section 841 as charged in
16  count two for which he may be prosecuted in a court of the
17  United States, did knowingly and unlawfully possess one or
18  more firearms, and did aid and abet the same, all in violation
19  of Title 18:924(c) and 2 which I read to you.
20          So that translates into the following essential
21  elements:
22          First, that the defendant committed the drug
23  trafficking crime possession with intent to distribute
24  methamphetamine as described in count two;
25          Second, defendant possessed a firearm in furtherance

1  of the commission of the crime charged in count two; and

2          Third, that defendant did all such acts knowingly,

3  willfully, and unlawfully;

4          Four, that he otherwise aided, abetted, counseled,

5  commanded, induced or procured the commission of this offense

6  as set forth in the elements one through three.

7          I'll define again certain of the terms here.  You

8  would apply them as you consider the evidence.  And again, if

9  I don't define any particular words, you would give them their

10  ordinary, everyday meanings.

11          Certain words defined in connection with counts one

12  and two also apply in count three and you would apply those

13  same definitions.

14          The offense charged in count two of the indictment,

15  possession with intent to distribute methamphetamine, is a

16  drug trafficking crime.  You'll recall that one of the

17  elements of the offense, that is, the second one is that

18  defendant possessed a firearm in furtherance of the commission

19  of the drug trafficking crime described in count two.

20          The term "firearm" means any weapon which will or is

21  designed to or may readily be converted to expel a projectile

22  by the action of an explosion and includes any handgun.

23          Testimony by witnesses that a firearm was used

24  without more can be sufficient evidence that an actual firearm

25  was possessed during a crime -- during a drug trafficking

crime.  A firearm need not be received or offered into
evidence to sustain such a conviction under 924(c).  So long
as the jury finds beyond a reasonable doubt based on the
evidence presented, including circumstantial evidence, that a
firearm was possessed, the jury may conclude that an actual
firearm was possessed and the government has proven this
element of the offense.

The words "knowingly" and "willfully" have already
been defined so I won't repeat that.

The word "unlawfully" simply means contrary to law.
So to do an act unlawfully means to do willfully something
which is contrary to law.

As to a defendant such as this defendant who is also
charged in this count under the alternative theory of aiding
and abetting, the government must prove that defendant's
knowledge of the firearm was either advance knowledge of it or
at least knowledge of a -- knowledge at a time the accomplice
can do something with it such as walk away.  Of course, if a
defendant continues to participate in a crime after a gun was
displayed or used by a co-conspirator or a confederate, the
jury can permissibly infer from his failure to object or
withdraw that he had such knowledge.

Now, defendant has been charged with possession of a
firearm in furtherance of a drug trafficking crime.  In order
to find him guilty of that charge, the government must prove

1  the following two aspects beyond a reasonable doubt:

2          First, that defendant knowingly possessed a firearm;
3  and

4          Next, that his possession promoted, furthered,
5  advanced or helped the commission of the drug trafficking
6  crime, or that he aided and abetted this crime.

7          In order for a defendant to possess a firearm, he
8  need not use, brandish or actively employ the firearm.
9  Instead, a defendant need only exercise control or authority
10 over the firearm at a given time.  The mere presence of a
11 firearm at the scene of a crime, that is, a drug trafficking
12 crime will not suffice.

13         Further, such possession must be in furtherance of
14 the alleged crime.  In other words, a defendant's possession
15 of a weapon must promote or advance the alleged drug
16 trafficking crime in some way.  Factors that may be considered
17 in determining whether possession is in furtherance of a drug
18 trafficking crime include the accessibility of the firearm,
19 the proximity of the firearm to a defendant, the type of
20 weapon, and the time and circumstances under which the firearm
21 is found.

22         So concluding as to count three, if you find from
23 the evidence beyond a reasonable doubt that on or about the
24 date alleged, July 6, 2013, within the Western District of
25 North Carolina, that defendant committed the drug trafficking

crime of possession with intent to distribute methamphetamine

as described in count two;

Next, that he possessed a firearm in furtherance of

the commission of that drug trafficking crime as described in

count two; and

Third, that defendant did all these acts knowingly,

willfully, and unlawfully, or

Alternatively, that his -- that defendant otherwise

aided, abetted, counseled, commanded, induced or procured the

commission of this offense as set forth in the elements one

through three, then it would be your duty to return a verdict

of guilty as charged.  However, if you do not so find or if

you have a reasonable doubt as to one or more of those

essential elements, then it would be your duty to give him the

benefit of that doubt and return a verdict of not guilty.

Now, in count four, defendant is charged with

violating Title 18, Section 922(g)(1).  Count four is not

evidence.  It does allege as follows:

On or about July 6, 2013, in Burke County, within

the Western District of North Carolina, and elsewhere,

defendant, Roger Dale Franklin, having previously been

convicted of one or more crimes punishable by imprisonment for

a term exceeding one year, did knowingly possess in or

affecting commerce -- and affecting commerce one or more

firearms, that is, a Taurus TCP .380 handgun and ammunition,

1    in violation of Section 922(g)(1).

2              Now, 922(g)(1) reads:  It shall be unlawful for any

3    person who has been convicted in any court of a crime

4    punishable by imprisonment for a term exceeding one year to

5    possess in or affecting commerce any firearm.

6              So here are the essential elements.  To find him

7    guilty in this count, the government must prove the following

8    beyond a reasonable doubt:

9              That within the Western District of North Carolina,

10   on or about -- excuse me, at the time alleged, July 6, 2013,

11   first, defendant had been convicted of a crime punishable by

12   imprisonment for a term exceeding one year;

13             Second, that after this conviction, defendant

14   knowingly possessed one or more of the firearms described in

15   count four of the bill of indictment;

16             Lastly, that the firearm defendant possessed was in

17   or affecting interstate commerce.

18             Now, the phrase "crime punishable by imprisonment

19   for a term exceeding one year" generally means a crime which

20   is a felony.

21             The word "knowingly" has already been defined for

22   you.

23             The term "possession" has already been defined when

24   I was describing count one.  Please consider the following

25   instruction also as to possession in regard to this count.

1          If you find beyond a reasonable doubt that the gun

2    was found in close proximity to the defendant, that would be a

3    circumstance from which, together with other circumstances,

4    you may infer that defendant was aware of the presence of the

5    gun and had the power and intent to control its disposition or

6    use.  However, the defendant's physical proximity, if any, to

7    the gun does not by itself permit an inference that defendant

8    was aware of its presence or had the power or intent to

9    control its disposition or use.  Such an inference may be

10   drawn only from this and any other circumstances which are

11   shown from the evidence beyond a reasonable doubt.

12          And I've already defined "firearm" for you.

13          The phrase "in or affecting commerce" includes

14   commerce between any place in a state and any place outside of

15   that state.  Through this element the government need not show

16   evidence concerning when or how a particular firearm may have

17   come across a state line.  It is sufficient if the evidence

18   establishes beyond a reasonable doubt that the firearm

19   originated in one state or foreign country and was found in

20   another state or country.

21          So then, concluding on count four, if you find

22   defendant guilty of the offense charged -- in order to find

23   him guilty under count four, then, the government must prove

24   as follows beyond a reasonable doubt these essential elements:

25          First, that within the Western District of North

Carolina at the time alleged, July 6, 2013, defendant had been
convicted of a crime punishable by imprisonment for a term
exceeding one year;

Next, after this conviction, he knowingly possessed
the firearm described in count four; and

Lastly, that the firearm possessed was in or
affecting interstate commerce. And if the government so
proves, then it would be your duty to return a verdict of
guilty as charged. However, if you do not so find or have a
reasonable doubt as to one or more of these essential
elements, then it would be your duty to give him the benefit
of that doubt and return a verdict of not guilty.

Now, as to count five, you'll recall defendant is
alleged to have violated Section 841 in count two on or about
July 6, 2013. Count five concerns activities allegedly
occurring on or about August 19, 2013. In addition, count
five also includes the allegation that defendant aided or
abetted the violation of Section 841. The aiding and abetting
charge changes the essential elements from those in count two
by creating an alternative proof -- or avenue of proof, simply
the aiding and abetting allegation.

Now, count five, I'll read it for you. It alleges
that on or about August 19, 2013, in Caldwell County, within
the Western District of North Carolina, and elsewhere, Roger
Dale Franklin did knowingly and intentionally possess with

intent to distribute a controlled substance, that is, a
mixture containing -- excuse me.  A mixture and substance
containing a detectable amount of methamphetamine, a Schedule
II controlled substance, in violation of Title 21,
Section 841, and did aid and abet that offense.

Now, then, for you to find the defendant guilty of
that offense, the government must prove the following
essential elements beyond a reasonable doubt:

That on or about August 19, 2013, within the Western
District of North Carolina, first, defendant possessed a
narcotic controlled substance, methamphetamine;

Secondly, that defendant had knowledge of the
possession of it;

Third, that he had the intent to distribute that
narcotic substance, or, alternatively, that he otherwise
aided, abetted, counseled, commanded, induced or procured the
commission of that offense as described in these essential
elements.

I have already defined "possession with intent to
distribute a controlled substance" and "knowingly" and
"willfully."

Once more, a few words about aiding and abetting.

The law holds that one who knowingly aids, abets,
counsels, commands, induces or procures the commission of a
crime is just as criminally responsible as the one who

actually commits it.  To be convicted of aiding and abetting, the government is not required to prove participation at every stage of an illegal venture.  However, the government is required to prove that the defendant knowingly associated himself with and participated in the criminal venture.  In other words, you should only find the defendant guilty under the aiding and abetting theory if the evidence proves beyond a reasonable doubt that the defendant knowingly participated in the principal's criminal intent.

Finally, under the law it's not necessary that the principal, that is, the one who actually committed the crime, be convicted for you to find the defendant guilty of aiding and abetting the offense.

So once again, summarizing as to count five, restating the essential elements.

If you find beyond a reasonable doubt from the evidence that on or about August 19, 2013, in the Western District of North Carolina, that defendant possessed a narcotic controlled substance, methamphetamine;

That he had knowledge of the possession of the controlled substance;

That he had the intent to distribute the narcotic controlled substance, or

That he otherwise aided, abetted, counseled, commanded, induced or procured the commission of that offense,

1  then it would be your duty to return a verdict of guilty.  If,
2  however, you do not so find or if you have a reasonable doubt
3  as to one or more of these essential elements, then it would
4  be your duty to give defendant the benefit of that doubt and
5  return a verdict of not guilty.

6          Now, moving to count six.  You recall defendant is
7  alleged to have violated the same provisions of law as you
8  find in count three.  This count concerns the same types of
9  allegations with the same definitions.  The difference between
10 counts three and six are the date of the alleged offense and
11 the underlying offense giving rise to the possession of a
12 firearm charge.  So count six reads as follows:

13         That on or about August 19, 2013, in Caldwell
14 County, within the Western District of North Carolina, and
15 elsewhere, defendant, Roger Dale Allen [sic], in furtherance
16 of a drug trafficking crime, that is, conspiracy to distribute
17 and to possess with intent to distribute methamphetamine, in
18 violation of Title 21, U.S. Code, Section 846 as charged in
19 count one, and possession with intent to distribute
20 methamphetamine, a violation of Title 21, U.S. Code,
21 Section 841 as charged in count five for which he may be
22 prosecuted in a court of the United States, did knowingly and
23 unlawfully possess one or more firearms, and did aid and abet
24 the same, all in violation of Sections 924(c) and 2.

25         Accordingly, I won't repeat verbatim what was stated

earlier, but you are instructed that to find the defendant guilty of the offense charged in count six, the government must prove the following essential elements beyond a reasonable doubt:

That on or about August 19, 2013, defendant committed the underlying drug trafficking crimes, namely, conspiracy to distribute and to possess with intent to distribute methamphetamine as charged in count one, or possession with intent to distribute methamphetamine as described in count two -- excuse me, count five;

Next, that defendant possessed a firearm in furtherance of the commission of the crime -- the drug trafficking crime described in counts one or five; and

Third, that defendant did such acts knowingly, willfully, and unlawfully; or

That defendant otherwise aided, abetted, counseled, commanded, induced or procured the commission of this offense, and if the government so proves, then it would be your duty to return a verdict of guilty as to count six.  However, if you do not so find or if you have a reasonable doubt as to one or more of these essential elements, then it would be your duty to give him the benefit of that doubt and return a verdict of not guilty.

Now, then, as to seven, it alleges that on or about August 19, 2013, in Caldwell County, within the Western

1  District of North Carolina, and elsewhere, defendant, having

2  been convicted previously of one or more crimes punishable by

3  imprisonment for a term exceeding one year, did knowingly

4  possess in and affecting commerce one or more firearms, that

5  is, an Interarms .38 Special revolver and ammunition,

6  violating Section 922(g)(1).

7       Now, this count, of course, alleges here that

8  defendant violated the same provision we went over in count

9  four.  This count seven concerns the same types of allegations

10 as count four and has the same definitions.  The difference

11 between the two counts are the date of the alleged offense and

12 that the firearm was allegedly possessed by the defendant.

13      The Court won't repeat verbatim what was stated

14 earlier, but you are instructed that to find defendant guilty

15 of the offense charged in count seven, the government must

16 prove the following essential elements beyond a reasonable

17 doubt:

18      That within the Western District of North Carolina,

19 that on or about August 19, 2013, he had been convicted of a

20 crime punishable by imprisonment for a term exceeding one

21 year;

22      That after that conviction, he knowingly possessed

23 the firearm described in count seven; and

24      Third, that the firearm defendant possessed was in

25 or affecting interstate commerce, then if the government so

1  proves, then it would be your duty to return a verdict of
2  guilty as charged as to count seven.  But if you don't so find
3  or have a reasonable doubt as to one or more of these
4  essential elements, then it would be your duty to give him the
5  benefit of that doubt and acquit him accordingly.

6          Now, as to count eight, as you recall, he's alleged
7  to have violated Section 841 in count two, alleged to have
8  done so on or about July 6, 2013.  Count eight describes
9  similar allegations.  The only difference between counts two
10 and eight concerns the date of the alleged offense.  Further
11 note that count eight does not include the aiding and abetting
12 allegation.  Accordingly, the Court will not repeat verbatim
13 the definitions and instructions given with regard to count
14 two as they apply equally here.

15         Now, then, members of the jury, I charge you,
16 therefore, on the essential elements, that if you find beyond
17 a reasonable doubt from the evidence that on or about
18 September 3, 2013, in the Western District of North Carolina,
19 that defendant possessed a narcotic controlled substance,
20 methamphetamine;

21         That defendant had knowledge of the possession of a
22 controlled substance; and

23         Third, that the defendant had the intent to
24 distribute the narcotic controlled substance, then it would be
25 your duty to return a verdict of guilty as charged.  But if

you do not so find or have a reasonable doubt as to one or more of these essential elements, then it would be your duty to give defendant the benefit of that doubt and return a verdict of not guilty.

Now, you'll recall defendant is alleged to have violated 21, U.S. Code, Section 841 in count two on or about July 6, 2013, and in count eight on or about September 3, 2013. Count nine describes similar allegations. The only difference between counts two, eight, and nine concerns the date of the alleged offense. Further note that count nine does not include an aiding and abetting allegation. Accordingly, the Court won't repeat the various definitions and instructions given in that regard.

Count nine reads as follows:

It alleges that on or about November 20, 2013, in Caldwell County, within the Western District of North Carolina, and elsewhere, that defendant, Roger Dale Allen [sic], did knowingly and intentionally possess with intent to distribute a controlled substance, that is, a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, U.S. Code, Sections 841 and 841(b)(1)(C). That's count nine.

So I charge you if you find from the evidence beyond a reasonable doubt that on or about November 20, 2013, that defendant possessed a narcotic controlled substance,

162

1 methamphetamine;

2       That he had knowledge of the possession of the
3 controlled substance; and

4       That he had the intent to distribute the narcotic
5 controlled substance, then it would be your duty to return a
6 verdict of guilty as charged in count nine.  But if you do not
7 so find or have a reasonable doubt as to one or more of these
8 essential elements, then it would be your duty to give him the
9 benefit of that doubt and return a verdict of not guilty.

10       Excuse me just a minute, members of the jury.  Let
11 me see you a minute.

12       (The Court and the law clerk conferred.)

13       THE COURT:  Now, members of the jury, I'll go on
14 with the last page or so here.

15       You have heard the evidence and the arguments of
16 counsel for both parties.  It is your duty to remember the
17 evidence whether it was called to your attention or not.  And
18 if your recollection of the evidence should differ from that
19 of the attorneys, you are to rely solely upon your
20 recollection of the evidence in your deliberations.

21       I have not reviewed the contentions of the parties
22 as made in their arguments, but it is your duty not only to
23 consider all the evidence, but to consider the arguments, the
24 contentions and positions urged by the attorneys in their
25 speeches to you, and any other contention that arises from the

1  evidence and to weigh them all in the light of your common
2  sense and as best you can determine the truth of this matter.
3       The law, as indeed it should, requires the presiding
4  judge to be impartial.  Therefore, do not assume from anything
5  I may have said or done during the trial that I have any
6  opinion concerning any of the issues in this case.
7       I instruct you that a verdict is not a verdict until
8  all 12 jurors agree unanimously as to what your decision shall
9  be.  You may not render a verdict by majority vote or any
10 other voting mechanism aside from a unanimous verdict of 12.
11 And that applies to all the decisions that you may make in
12 regard to the verdict sheet and in applying the Court's
13 instructions.
14      The Court suggests that as soon as you reach the
15 jury room -- and this, of course, will happen in the morning,
16 because we're going to adjourn here in just a moment.  The
17 Court suggests that when you do reach the jury room tomorrow
18 morning, that before beginning deliberations you select one of
19 your members to serve as the foreperson.  This individual has
20 the same vote as the rest of the jurors, but simply serves to
21 preside over the discussions.
22      Once you begin deliberating, if you need to
23 communicate with the Court, the foreperson would send a
24 written message to me by knocking on the door and handing it
25 to the marshal.  The message should include the date and time

of the message.  However, if you're not -- you would not tell me at any time how you may stand numerically as to your verdict.  For instance, should you be split in your voting at any particular time, you wouldn't tell me any specific numbers of division in your note.

We use a verdict sheet.  It is simply a written notice of the decision you reach in the case.  As soon as you have reached a verdict, you'll return to the courtroom and your foreperson will, on request, hand the verdict sheet to the clerk.  There are places on the verdict sheet for the foreperson to enter the verdict, sign it and date it.  And of course, in this case we have the nine counts so you'll -- once you look at the verdict sheet, you'll see how it is fashioned and you'll see how it moves from one count to the other and instructs you what to do next as you go through the various questions that are posed on there.

Now, during the trial a number of items were received into evidence as exhibits.  You will have access to most of the trial exhibits through the -- what we call the JERS program that will be explained to you by the clerk if she hasn't already done so.

Now, during your deliberations you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media such as a cell phone, smart phone, BlackBerry,

1    iPhone, or computer of any kind, the internet or any internet
2    service, any text or instant messaging service like Twitter or
3    any internet chat room, blog, website or social networking
4    service such as Facebook, MySpace, LinkedIn or YouTube to
5    communicate with anyone any information about this case or to
6    conduct any research about it until I accept your verdict.
7    And of course, that applies overnight.  You'll remember my
8    instructions about that.  They are very inclusive, so you
9    would resolve any questions in favor of not looking at or
10   attempting to look at or exposing yourself to any information
11   other than what you have already heard in this courtroom
12   between now and your commencement of deliberations.
13           If you need a break during your deliberations in the
14   morning, you may do so in the jury room, or if it's a smoke
15   break, then outside the jury room escorted by a marshal.  But
16   you must not deliberate during a break unless all 12 of you
17   are together.  If not together, then do not talk about the
18   case until all of you are back together.
19           Now, the -- we would ask the two alternates, the
20   last two jurors in the upper row there, you're 13 and 14, you
21   are the alternate jurors and the importance of your service is
22   that -- and we'll need for you to come back tomorrow morning
23   also.  If some juror has an issue that arises that prevents
24   that juror from completing deliberations, you would be
25   available if it were one or two jurors to take the place of

1 such a juror or jurors so that we don't have to do the trial

2 all over for short -- for having been short a juror or two.

3          So I thank all of you for your careful attention to

4 these matters.

5          I would ask the attorneys to see me at the sidebar.

6 We'll take a short sidebar conference.  I'd ask all of you

7 just to be at ease here for a couple of minutes while we do

8 that.  Thank you.

9          (Sidebar conference as follows:)

10          THE COURT:  First of all, I wanted to ask if any of

11 you all had any question or comments or objections concerning

12 the instructions?

13          MR. KAUFMAN:  The only thing, Your Honor, and I

14 don't know if I want to necessarily call great attention to it

15 now that we're kind of out of step, but we had submitted a

16 special jury instruction request regarding the admissibility

17 and lawful seizure of the evidence from August 19th.

18          THE COURT:  Right.  I saw that, of course, and it

19 seemed to me that if I told the jury that they should consider

20 all the evidence, which I've done several times, and that the

21 evidence that they have received is all admissible, I thought

22 that would cure it.  And also, there were no arguments really

23 that went to Fourth Amendment issues.

24          MR. KAUFMAN:  Yes, sir.

25          THE COURT:  So I think it would have just confused

1   the jury if I had gone into that.

2           MR. KAUFMAN: Yes, sir.

3           THE COURT: So I declined to give that instruction.

4           MR. KAUFMAN: Okay.

5           THE COURT: Now, I did have a question. I wanted to

6   make sure we were right about the elements.

7           MR. DURANT: All right. So like with the 841

8   elements, it looks like we have a redundant element.

9   Normally -- this case is from '96. And the Eleventh Circuit

10   patterned jury instructions say possession, knowledge of the

11   possession and intent to distribute. I mean, that's what we

12   have right here and that's from the Fourth Circuit. So I

13   think that's right.

14           THE COURT: Fourth Circuit approving the Eleventh

15   Circuit.

16           MR. DURANT: This is the Fourth Circuit. The

17   Eleventh Circuit combines knowledge and possession into one

18   jury instruction. But this case is from '96 from the Fourth

19   Circuit.

20           THE COURT: Yeah.

21           MR. DURANT: And it sets them out the way we have

22   them set out, so I think it's fine. It's also from, I think,

23   the *Mondragon* case too, that exact instruction.

24           THE COURT: All right. There was no objection.

25           MR. THORSEN: No objection.

1    MR. KAUFMAN:  If defense is happy, I'm happy, Your
2    Honor.
3    THE COURT:  Thank you all.  All right.  That wraps
4    up the jury charge conference unless you want to bring up
5    something that you discover overnight.
6    MR. KAUFMAN:  Yes, Your Honor.
7    (End of sidebar conference.)
8    THE COURT:  Okay.  Members of the jury, we have
9    nothing further for your attention today.  Keep an open mind
10   about the case.  Don't discuss it with anyone.  Anyone who
11   asks you about it, simply tell them the Court has told you not
12   to discuss it, but that after it's over later on tomorrow,
13   that you may discuss it all you wish to.
14   All right.  Thank you all very much.  9:30 in the
15   morning.  Now, what we'll do is ask you to come in.  And just
16   go on in -- the 12 of you go on in the jury room.  And the
17   clerk will show the two alternates where you'll be going
18   tomorrow in just a minute.  Just go on in there and as soon as
19   all 12 of you are checked in, you may begin your
20   deliberations.  We won't need to bring you out in open court
21   and go through that.  You'll just start your deliberations at
22   that point.
23   And as I've said before, if you have messages or
24   anything you want to send to the Court by way of a question,
25   feel free to do that and your foreperson can take care of that

1  for you.

2          Thank you again for your attention, and we'll see

3  you in the morning.

4          (Jury exited the courtroom.)

5          THE COURT:  Okay.  The jury has departed.  There was

6  a question you all had brought up about stipulations, whether

7  they should be among the exhibits available to the jury in the

8  jury room on the JERS system.  And I think they're in there

9  now.  If there's no objection, we'll leave them in there.  All

10 right.  They've heard them verbally.  They can read them

11 again.  Won't make a lot of difference.

12         Thank you all.

13         MR. KAUFMAN:  Thank you, Your Honor.

14         MR. THORSEN:  Thank you, Your Honor.

15         (Evening recess at 5:19 p.m.)

16                      *****

17

18

19

20

21

22

23

24

25

```
 1   UNITED STATES DISTRICT COURT
 2   WESTERN DISTRICT OF NORTH CAROLINA
 3   CERTIFICATE OF REPORTER
 4
 5
 6            I, Cheryl A. Nuccio, Federal Official Realtime Court
 7   Reporter, in and for the United States District Court for the
 8   Western District of North Carolina, do hereby certify that
 9   pursuant to Section 753, Title 28, United States Code, that
10   the foregoing is a true and correct transcript of the
11   stenographically reported proceedings held in the
12   above-entitled matter and that the transcript page format is
13   in conformance with the regulations of the Judicial Conference
14   of the United States.
15
16            Dated this 31st day of May 2016.
17
18
19                          s/Cheryl A. Nuccio
20                          _____
                            Cheryl A. Nuccio, RMR-CRR
                            Official Court Reporter
21
22
23
24
25
```